Filed 11/10/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S065467 |
| v. | ) | |
| | ) | Los Angeles County |
| RONALD BRUCE MENDOZA, | ) | Super. Ct. No. KA 032117 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

A jury convicted defendant Ronald Bruce Mendoza of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found true the allegation that he personally used a firearm in commission of the murder (§ 12022.5, subd. (a)).  The jury also found true the three special-circumstance allegations that defendant intentionally killed a police officer (§ 190.2, subd. (a)(7)), that he committed murder for the purpose of avoiding a lawful arrest (§ 190.2, subd. (a)(5)), and that he intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15)). Thereafter the jury returned a verdict of death.  At the sentencing hearing, the trial court struck the lying-in-wait special circumstance and then entered a judgment of death.  Appeal to this court is automatic.  (§ 1239, subd. (b).)

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

Because the trial court had no authority to strike a special circumstance found by the jury, we reinstate the lying-in-wait special circumstance. As so modified, the judgment of death is affirmed.

## I. FACTS

### A. The Guilt Phase

At approximately 1:30 a.m. on May 11, 1996, defendant shot Pomona Police Officer Daniel Tim Fraembs in the face and killed him. The evidence included the testimony of an eyewitness to the shooting, defendant's pager found at the crime scene, testimonial and physical evidence linking defendant to the purchase of the murder weapon and ammunition, and telephone conversations between defendant and his mother, tape-recorded with court approval.

*1. The Prosecution Case*

Defendant, also known as "Boxer," was a member of the Happy Town street gang. In November 1995, defendant was released on parole from a California Youth Authority facility (CYA facility; now Div. of Juvenile Facilities). As two of the conditions of parole, he was not to possess any deadly weapon and was not to knowingly associate with gang members. Defendant was informed that violation of a parole condition could result in his return to a CYA facility, where he would face 575 days, plus an additional one year in custody for possession of a weapon. Defendant signed a form stating he understood the parole conditions.

Testimony from Jason Meyers and Dean Coleman established that about two weeks before Officer Fraembs's murder, Meyers drove defendant to Coleman's residence, where defendant purchased a Haskell .45-caliber handgun from Coleman for $150 or $155. Meyers agreed to buy bullets for the gun, because defendant did not have the required California driver's license or identification card to do so. They went to a Big 5 Sporting Goods store, where

2

Meyers used defendant's money to purchase a green and yellow box of Remington .45-caliber bullets.

Johanna Flores was 19 years old at the time of the 1997 trial. Her nickname was "Goon," but she did not belong to any gang. Flores had been in a romantic relationship with defendant and was with him when he shot Officer Fraembs. She testified as the key witness against defendant regarding the events of the night leading up to the murder.

Flores testified that on May 10, 1996, after her work shift ended at 11:00 p.m., she went with Chantal Cesena to the Pomona home of a Happy Town gang member named "Tank," where Flores saw defendant and another gang member named Jasper. Defendant wore black jeans, a white shirt, and a black bomber-style jacket with orange lining, small pockets, and a front zipper. Defendant, Flores, Jasper, and Chantal Cesena sat talking together for a while. At some point, Chantal Cesena received a call from her relative, Joseph "Sparky" Cesena, asking her to pick him up.[2] Chantal declined, saying she had to do something else.

At a later point, defendant and Flores argued over a page defendant received from Brandy Valore, the mother of his child. Flores punched defendant on his left side, hitting a gun tucked into his waistband. Flores saw the gun when defendant removed it from his waistband to check it. She had seen defendant with this gun before; he said it was a .45-caliber gun.

After things calmed down between defendant and Flores, they both spoke with Sparky by telephone. Defendant and Sparky agreed to meet by the railroad tracks, and Flores decided to go along. When they left Tank's house, defendant was carrying his gun and his pager.

---

[2] Henceforth we will refer to the two Cesenas by the names used at trial: Chantal and Sparky.

On their way to the railroad tracks, defendant and Flores encountered a man and two women (Jason Meyers, Cherie Hernandez, and Elva Arambula) who were walking from the opposite direction. When one of the women (Hernandez) gave defendant a cigarette and lit it for him, Flores got mad and cursed and slapped defendant.[3] The two groups separated, and defendant and Flores continued toward the railroad tracks. As they neared the tracks, Sparky appeared from a small pathway through some bushes. Sparky wore gray khaki pants, a white shirt, and a gray and black striped sweater. He had a knife.

As the three walked back to Tank's house, a bright light turned on behind them. Defendant looked over his left shoulder and said, "Oh, shit, the *jura*." "*Jura*" meant "cops." A police car stopped behind them, and Officer Fraembs exited the vehicle. Defendant said, "Oh, shit. I got the gun." Flores told defendant to run, because she did not want him to "get in trouble" or "do anything stupid." Sparky also told him to run. Defendant stayed put.

Officer Fraembs asked, "How are you guys doing tonight?" Flores described Fraembs as "real nice" and not like other police officers who were mean or sarcastic. She thought Fraembs might have stopped them "for curfew check, nothing major." Defendant responded to Fraembs's inquiry with "an attitude," saying something like, "What the hell are you stopping us for" or "What are you stopping us for." Defendant was being "rude" and "a jerk." At that point, Fraembs told defendant and Flores to "have a seat right there," indicating the curb.

---

[3]     Flores did not know the names of these individuals, but Meyers and Arambula also testified about the encounter. Arambula further testified that, after her preliminary hearing testimony, she received what she perceived to be a threat, although defendant was not the person who made the threat.

He called Sparky, who was wearing a knife sheath and was nearest to him, over to the patrol car. Sparky put his hands on the hood, and Fraembs stood behind him.

As Officer Fraembs started patting down Sparky, defendant slowly moved behind Flores and draped his left arm over her shoulder while leaving his right hand free. Defendant was standing very close behind Flores, with his chest against her back, and leaning forward as they moved toward the street. He slowly pushed her forward, forcing her to step off the curb into the street. Flores felt defendant slide his hand down between himself and the small of her back as he continued to move her toward Fraembs, who was still patting down Sparky. When they got within six or seven feet of Fraembs, defendant pushed Flores aside.

At that point, Flores turned back to look at defendant and saw him with his arms stretched out and both hands holding the gun. He took another step or two toward Officer Fraembs, and pointed the gun at the officer's upper body from a distance of about two and a half feet. Defendant fired once, shooting Fraembs in the face.

Immediately afterward, defendant turned the gun on Flores and asked, "Are you going to say anything?" Flores replied, "No, I didn't see nothing, I didn't hear nothing, I don't know nothing." Flores took defendant's threat seriously, and when he repeated his question, she repeated she didn't hear, see, or know anything.

Defendant told Flores to run, then he took off running. Flores starting running behind defendant, but soon lost sight of him. Defendant did not look back at Flores and did not wait for her to catch up to him. Sparky had already run away, back toward the bushes from which he had earlier emerged.

As Flores ran, she began hearing sirens and ran faster. She reached her home, but did not sleep. She did not call 911 or the police to report the shooting,

5

because she was afraid defendant and his gang would do something to her. At sunrise, Flores told her sister what had happened.

Early in the morning of May 11, 1996, Flores called defendant at his home. His brother Angel, who belonged to the Happy Town gang and was known as "Bandit," answered. Angel said something threatening to Flores, then handed the phone to defendant. When Flores asked how defendant was, he replied, "I'm fine. I'm a killer." Defendant said he didn't give a fuck, and "It's just another day in the hood." Defendant asked Flores about his pager and told her, "I think I lost it over there."

Later that day or the following day, Flores told her parents what happened. Her father spoke with their family priest, Father Charles Gard, who offered to speak with Flores. On May 15, 1996, Flores told Gard about the shooting and defendant's involvement. She was "very upset" and "very distraught," yet "very confident in what she was saying."[4] Gard persuaded Flores to talk to the police.

Two homicide detectives interviewed Flores at Father Gard's church. At first Flores did not tell the detectives about Chantal and Jasper being at Tank's house before the shooting. Chantal was Flores's good friend and Flores did not want anything to happen to her. Flores was also afraid that Jasper might do "something" if she said he was there. But even though Flores had been threatened by both defendant and his brother, she ultimately decided to testify because she believed that what defendant did was wrong, and that he had the chance to run away but did not do so. At Flores's request, however, the Pomona Police Department relocated her and her family.

---

**4** Flores spoke to Father Gard in confidence because she feared retaliation. She eventually gave him permission to testify regarding her statements.

6

Evidence at the crime scene corroborated Flores's testimony and statements.  Officer Fraembs was found shot in the face, with his gun secured in its snapped-shut holster and his baton still attached to his belt.  A spent shell casing was on the ground about 12 feet from the body, and an expended bullet lay in the grass about 40 to 50 feet away.  A senior criminalist with the sheriff's department testified that the casing was made by Remington Peters and designed for a .45-caliber semiautomatic weapon, and was consistent with the expended bullet.  The criminalist's examination of these items indicated that the projectile could have been fired from a Haskell .45-caliber semiautomatic weapon.  Additionally, defendant's pager was found at the scene.

In a search of defendant's residence, police found a green and yellow Remington .45-caliber ammunition box bearing a Big 5 Sporting Goods price tag in the bedroom occupied by defendant's mother and Harry Lukens.  The box contained one .32-caliber bullet and an otherwise empty plastic ammunition tray, on which defendant's left thumbprint was found.  A black nylon camera lens case containing 17 Remington .45-caliber bullets was recovered from a trash can in the enclosed back yard.  Lukens identified the lens case as his, but not the bullets.  He had not seen the case for a year and did not know how it got into the trash can.

Defendant made incriminating statements after the murder.  He initially sold the murder weapon to Joseph Silva for $100, telling him, "Hey, did you know I killed a cop?"  Defendant later decided to get the gun back and told Silva, in a police-recorded telephone conversation, "I'm gonna have somebody come and pick it up from you man . . . .  I can't have that in Pomona."  Around that time, a Happy Town gang member named "Casper" warned Silva that he and his entire family would be killed if Silva were to testify that defendant admitted shooting a police officer.  Defendant's brother Angel retrieved the gun from Silva.

7

While defendant was in custody, the court approved the recording of his telephone conversations with his mother, Lola Delgado. On May 22, 1996, defendant told his mother to burn a certain jacket. Although the statements in that conversation were not entirely clear, defendant apparently was referring to the jacket he wore the night of the murder, a black and orange jacket with tiny pockets. On May 24, 1996, defendant told his mother he wanted "Goon" (Flores) to be told she "better realize what she's doing." After complaining that Goon was "suppose to be gang" but "now she's fucking crumbling down," defendant told his mother, "we gotta do something" because "if she's a witness, I'm gonna be gone." Defendant also warned that "as far as she's willing to go, the police ain't going to protect her."

### 2. *The Defense Case*

Rupert Bascomb, a private security guard, testified he was on duty at a company at the time and near the scene of the murder. He observed a police car cruise by "real slow" and then drive out of sight. Shortly thereafter, Bascomb heard a gunshot and then a woman's voice say, "Let's get out of here" or "Let's move from here." He thought he saw two possibly male figures wearing dark clothing run toward an incinerator behind a building. One had something in his hand.

The defense sought to undermine Johanna Flores's credibility and to establish her bias against defendant. It also argued that if the jury believed defendant was the shooter, it should find he did not act with premeditation. Finally, the defense contended that Officer Fraembs did not act lawfully when he stopped and detained defendant, Sparky, and Flores.

## B. The Penalty Phase

### 1. *The Prosecution Case*

The prosecution presented evidence that on July 30, 1994, Ryan Schultz and his girlfriend drove to a house in Pomona to smoke marijuana and "get high" with some friends. While Schultz was inside the house, more than 10 gunshots were fired outside. Schultz went outside and saw that his brand new 1994 Ford Thunderbird had been "shot up." Three or four individuals, including defendant, were standing by Schultz's car, and defendant was holding an M-1 military rifle. Schultz ran back into the house, followed by defendant and his companions. Defendant used his rifle to hit Schultz in the face and on the side of the head. Schultz fell to the ground and was beaten. Afterward, defendant "basically" told Schultz to "get the fuck out the house before we kill you." Schultz suffered injuries to his head, face, and arms; his jewelry and money were taken.

The prosecution also presented victim impact testimony from Officer Fraembs's adoptive mother and sister, and from two police officers who had worked and formed close friendships with him.

### 2. *The Defense Case*

Defendant's aunt testified regarding defendant's family and his care by his grandparents while his mother was in prison. His aunt was "very surprised" to learn of his involvement in the killing of a police officer, and asked the jury to consider defendant's daughter and family.

Brandy Valore, the mother of defendant's baby daughter, testified she was first attracted to defendant because he had "good manners" and was "real polite, very intelligent." Valore said defendant loved his daughter and asked the jury to spare his life for his daughter's sake.

9

## II. DISCUSSION

### A. Sufficiency of Premeditated and Deliberate Murder Evidence

Defendant contends the evidence was insufficient to sustain his conviction of premeditated and deliberate first degree murder. This claim is without merit for the reasons below.

In assessing the sufficiency of the evidence supporting a jury's finding of premeditated and deliberate murder, a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence — that is, evidence which is reasonable, credible, and of solid value — from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Burney* (2009) 47 Cal.4th 203, 253; *People v. Perez* (1992) 2 Cal.4th 1117, 1124.) When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment. (*Ibid.*)

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' (*People v. Sanchez* (2001) 26 Cal.4th 834, 849; see *People v. Harris* (2008) 43 Cal.4th 1269, 1286-1287.)" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

In *People v. Anderson* (1968) 70 Cal.2d 15, we identified three types of evidence — evidence of planning activity, preexisting motive, and manner of

killing — that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. (*People v. Solomon*, *supra*, 49 Cal.4th at p. 812.) We have made clear, however, that " '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' [Citations.]" (*Ibid*.) Using *Anderson* as a guide, we turn to the instant record.

### 1. Planning Activity

Defendant contends there was no evidence of a prior plan to kill or even meet Officer Fraembs, emphasizing it was Fraembs who initiated the early morning encounter. Defendant also points to Flores's testimony that he was nervous after shooting the officer and acted like he did not know what he had just done; this, he claims, did not suggest he killed as the result of "preexisting reflection" rather than "mere unconsidered or rash impulse." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1125.) We are not convinced.

In *People v. Brady* (2010) 50 Cal.4th 547, the defendant shot a police officer only a few minutes after the officer first shined his patrol vehicle's spotlight on the defendant's car. In rejecting the argument that evidence of extensive planning was lacking, we found that a rational trier of fact could have concluded that the defendant, knowing he illegally possessed a firearm, rapidly and coldly formed the idea to use his firearm before the officer became aware of its existence. (*Id*. at pp. 563-564; *People v. Solomon*, *supra*, 49 Cal.4th at p. 812 [cold, calculated judgment may result from thoughts occurring in rapid succession].)

Here, as in *People v. Brady*, the record contains substantial evidence that the killing did not result from an unconsidered or rash impulse. Although defendant did not initiate the contact with Officer Fraembs, Flores's testimony

11

amply supported the inference that defendant devised a plan to kill Fraembs once the officer indicated he would conduct a weapons search. As Fraembs began his patdown of Sparky, defendant acted as if he were complying with Fraembs's direction to sit down on the curb. By using Flores as a shield and carefully controlling her movement, defendant was able to approach Fraembs without attracting attention and to maneuver himself to a position of advantage over the unsuspecting officer. Once defendant got within six or seven feet of the officer, he was able to draw his gun while still screened by Flores. Defendant then pushed her aside and quickly stepped even closer to Fraembs. He took aim with both arms extended and shot the officer in the face. Defendant's plan proved successful, as Fraembs was taken utterly by surprise and had no opportunity to reach for his own weapons.

### 2. *Preexisting Motive*

Defendant claims the prosecution failed to show a motive consistent with planning and deliberation, because the evidence was insufficient to prove he killed Officer Fraembs in order to avoid arrest and parole revocation. We disagree.

Although defendant was never heard to say he killed to avoid arrest and parole revocation, ample circumstantial evidence supported this point. Defendant was on parole and subject to parole conditions that he not possess a weapon and not knowingly associate with gang members. Having signed a form acknowledging the terms of his parole, defendant knew that a violation could result in his being returned to a correctional institution for 575 days, plus a possible additional year for the actual possession of a weapon.

The evidence of defendant's parole conditions provided context to his murderous action. A month or two before the shooting, defendant told Flores he was on parole and "didn't want to go back" or "couldn't go back" to jail. More

12

critically, on the night of the murder, defendant told Sparky to "hurry up" and meet him by the railroad tracks "because I'm strapped," meaning defendant was carrying a gun, and "I don't want to get busted." When Officer Fraembs pulled up behind defendant, Sparky, and Flores, defendant said, "Oh, shit, the *jura* [cops]" and "Oh, shit. I got the gun." Both Sparky and Flores told defendant to run, but he did not do so. Instead, defendant was "rude" and acted like a "jerk" in challenging Fraembs. Fraembs responded by conducting a weapons search, presumably for officer safety reasons.

As the prosecution told the jury during closing argument, it was reasonable to infer from this evidence that once Officer Fraembs started to pat down Sparky, defendant figured his turn would be next. Given the evidence of Fraembs's actions and defendant's knowledge that his gun possession violated his parole conditions, a rational jury could conclude that defendant's motive for killing the officer was to avoid arrest and a resulting return to custody. (See, e.g., *People v. Vorise* (1999) 72 Cal.App.4th 312, 318-319, 322 [rational jury could conclude that defendant shot victim to avoid lawful arrest, where evidence showed defendant drew his weapon and fired after hearing victim's wife say she was going to call police].)

### 3. *Manner of Killing*

Defendant concedes that a single shot to the head might support the inference of a deliberate intent to kill. We agree. (E.g., *People v. Caro* (1988) 46 Cal.3d 1035, 1050 ["a close-range gunshot to the face is arguably sufficiently 'particular and exacting' to permit an inference that defendant was acting according to a preconceived design"].) Defendant argues, however, that "there are absolutely no facts to support planning activity" on his part. We could not disagree more.

None of the evidence suggested that defendant fired his weapon in a rash or panicked reaction to Officer Fraembs's appearance on the scene; indeed, all the evidence pointed to the contrary. Although defendant was startled when Fraembs first pulled up, he refused to flee and instead opted to confront the officer. When Fraembs indicated he would conduct a weapons search, defendant reacted in a cool and focused manner: he contrived to act as if he were following Fraembs's instruction to take a seat on the curb, but in actuality he formed a plan to approach and shoot Fraembs while the officer was distracted with Sparky. Because the manner of killing reflected stealth and precision, a rational jury could conclude that a preconceived design was behind the killing. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [victims shot in the head or neck from within a few feet]; *People v. Marks* (2003) 31 Cal.4th 197, 232 [noting the calm, cool, and focused manner of the subject shootings].)

In sum, the evidence of planning, motive, and manner of killing was compelling and amply supported a finding of premeditation and deliberation.

### B. Sufficiency of Lying-in-wait Evidence

Following presentation of the prosecution's case-in-chief, defendant moved for a judgment of acquittal. (§ 1118.1.) As relevant here, defendant argued the evidence was insufficient to support the charge of first degree murder by means of lying in wait and the lying-in-wait special-circumstance allegation, primarily because it did not show a substantial period of watching and waiting for an opportune time to act. The trial court denied this motion. Subsequently, defendant objected to the giving of instructions on lying-in-wait first degree murder (CALJIC No. 8.25) and on the lying-in-wait special circumstance (CALJIC No. 8.81.15). He also requested that the court, pursuant to section 1385,

14

strike the allegation or disallow prosecution argument on these theories.  The court overruled the objection and denied the request.

After the jury rendered its guilt and death verdicts, defendant moved for a new trial and for modification of the verdict or reduction of the penalty.  As relevant here, he reiterated his contentions concerning the lying-in-wait evidence.  The trial court denied defendant's motions, but agreed the evidence of waiting and watching was insubstantial as a matter of law.  Relying specifically on section 1385, the court struck the lying-in-wait special circumstance.[5]

On appeal, both defendant and the People have complaints on this matter.  Defendant asserts the reading of jury instructions on lying-in-wait first degree murder and the lying-in-wait special circumstance was error and violated his state and federal constitutional rights to due process and reliable guilt and penalty determinations.  He further argues that the first degree murder conviction cannot be sustained on a lying-in-wait theory, and that the lying-in-wait special circumstance should remain stricken.  Conversely, the People seek reinstatement of the lying-in-wait special circumstance, contending it was supported by sufficient evidence and the trial court lacked the authority to strike it.  We address defendant's arguments first.

### 1. Requirements of Lying in Wait

The principles governing our analysis are settled.  " 'The requirements of lying in wait for first degree murder under Penal Code section 189 are "slightly different" from the lying-in-wait special circumstance under Penal Code section

---

[5]     The trial court used the terms "striking" and "dismissing" interchangeably to describe its ruling on the lying-in-wait special circumstance.  For purposes of our discussion, we discern no difference between the two terms and shall refer to the court's action as "striking" the special circumstance.

190.2, subdivision (a)(15).  [Citation.] . . .  We focus on the special circumstance because it contains the more stringent requirements.  [Citation.]  If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder.  [¶] The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ."  [Citations.]' " (*People v. Moon* (2005) 37 Cal.4th 1, 22.)

We have explained the elements of the lying-in-wait special circumstance as follows.  " ' "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct.  It is not required that he be literally concealed from view before he attacks the victim." ' " [Citation.]' " (*People v. Moon*, *supra*, 37 Cal.4th at p. 22.)  As for the watching and waiting element, the purpose of this requirement "is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.  [Citation.]  This period need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 202, fn. omitted.)[6]  "The factors of concealing murderous

---

[6]     In *People v. Stevens*, *supra*, 41 Cal.4th 182, we made clear that, although the first degree murder formulation refers to "by means of" lying in wait and the pre-2000 definition of the special circumstance referred to "while" lying in wait, such difference did not change "the principle that for a murder conviction and for a special circumstance finding the lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." (*Id*. at p. 202, fn. 11.)

16

intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.' [Citation.]" (*Stevens*, at p. 202.)

Defendant first claims the evidence was insufficient to prove a "substantial" period of watching and waiting for a favorable or opportune time to act, because the entire encounter was "fleeting" and it was "only a matter of seconds" until the shooting occurred.

As defendant acknowledges, we have never fixed a minimum time period for this requirement. Indeed, " '[t]he precise period of time is . . . not critical,' " so long as the period of watchful waiting is " 'substantial.' " (*People v. Moon*, *supra*, 37 Cal.4th at p. 23 ["a few minutes can suffice"]; see *People v. Edwards* (1991) 54 Cal.3d 787, 825-826 [wait was "a matter of minutes"].)

Here, it may be that only a few minutes elapsed between the time Officer Fraembs pulled up in his car and the time of the shooting. Nonetheless, a rational jury could find that defendant, who was carrying a gun in knowing violation of his parole conditions, decided at or near the outset of the encounter that he would kill the officer rather than face a certain return to custody. As the trial testimony reflected, when Fraembs drove up, defendant ignored the suggestions of both Flores and Sparky to simply flee the scene. At the point Fraembs exited his car to question them, defendant rudely challenged the officer, but did not panic or immediately reach for his gun and shoot. Instead, as Fraembs began a patsearch of Sparky after directing defendant and Flores to sit on the curb, defendant positioned himself behind Flores so that his right arm was hidden from the officer's view. He then controlled her movements in order to approach the officer without attracting attention. Once they were close enough that defendant could not miss hitting Fraembs, he pushed Flores aside, drew his weapon, and stepped even closer to the officer before firing. On this record, a rational jury could conclude that defendant did not react impulsively to Fraembs's appearance at the scene, but that he

17

watched Fraembs for a substantial period as he not only waited for, but affirmatively engineered, the opportune moment to launch a surprise attack.[7]

Defendant next contends there was insufficient evidence establishing the other lying-in-wait requirements of concealment of purpose and a surprise attack on an unsuspecting victim from a position of advantage. We disagree. Although Officer Fraembs was certainly aware of defendant's physical presence, the evidence reflected that defendant managed to conceal his murderous purpose so well that he took the officer completely by surprise when he fired the single deadly shot at close range. From this evidence, a rational jury could infer that defendant did not kill out of rash impulse, but rather in a purposeful manner that required stealth and maneuvering to gain a position of advantage over the unsuspecting officer. (See *People v. Russell* (2010) 50 Cal.4th 1228, 1245 [defendant "shot at the officers from a position of advantage before the officers had time to even draw their weapons"]; *People v. Moon*, *supra*, 37 Cal.4th at pp. 22-23; see also *People v. Stevens*, *supra*, 41 Cal.4th at p. 203 [substantial evidence of premeditation and deliberation dispels inference that killing resulted from a rash impulse].)[8]

---

[7] Flores told the police in a pretrial interview that defendant had "panicked" when Officer Fraembs stopped the three. At trial, she clarified that defendant appeared panicked when he first saw the light from the police car, but then moved slowly and deliberately as described above. After shooting Fraembs, however, defendant appeared scared he would be caught.

[8] Defendant claims that Officer Fraembs was not unsuspecting and not attacked from a position of advantage because Fraembs knew he was in a hostile environment and took protective action by conducting a patsearch. We disagree. Although Fraembs decided to take precautionary action, the police who responded to the shooting found him with his gun secured in its holster and his baton still attached to his belt. From this evidence, a rational jury could conclude that defendant took Fraembs completely by surprise.

18

Finally, defendant asserts his actions were not of the same character as those found to constitute lying in wait in other cases, e.g., he did not wait for a victim to arrive at a chosen location, or follow or lure a victim to a particular spot, or murder a victim in his sleep. No matter. Because each case necessarily depends on its own facts, and because defendant's conduct clearly satisfied each of the lying-in-wait requirements, the attempt to contrast this case with others falls short. (See *People v. Thomas* (1992) 2 Cal.4th 489, 516 [comparing facts of different cases did not demonstrate the insufficiency of premeditation evidence in the case at hand].)

Having determined that substantial evidence supported the lying-in-wait special-circumstance finding, we conclude the evidence necessarily supported the conviction of lying-in-wait first degree murder. (*People v. Moon*, *supra*, 37 Cal.4th at p. 24.) Accordingly, the trial court did not err or violate defendant's constitutional rights when it allowed the prosecution to present its lying-in-wait theory and instructed the jury accordingly. Nor did the jury act unreasonably in returning a first degree murder conviction and a true finding on the lying-in-wait special-circumstance allegation. No reversal is warranted.

### 2. *Authority to Strike the Special Circumstance*

We now address the trial court's section 1385 ruling. The People contend that, once the jury found the lying-in-wait special circumstance to be true, the trial court could not strike or dismiss it pursuant to section 1385. We agree.

Section 1385 generally authorizes a judge to order an action dismissed in furtherance of justice. (§ 1385, subd. (a).) However, section 1385.1 provides: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which . . . is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." In light of section 1385.1, the

19

court had no authority to strike the lying-in-wait special circumstance. (*People v. Lewis* (2004) 33 Cal.4th 214, 228; *People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1283.)

In its brief, the People requested that we reinstate the lying-in-wait special circumstance pursuant to section 1260.[9] In his reply brief, defendant objected to review of the section 1385 ruling on the ground that the People could not and did not separately appeal it. In light of the parties' contentions, we invited supplemental briefing on whether review of the trial court's ruling is appropriate under section 1252, which provides in part: "On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General."

Defendant advances three reasons why section 1252 does not provide a basis for the People to obtain appellate review of the trial court's ruling. First, he contends that the People's only remedy for obtaining review in this type of circumstance is to petition for writ of mandate in the Court of Appeal (Code Civ. Proc., § 1085),[10] and that here, the People's failure to do so bars our review of the issue. Second, defendant asserts that, even if review is appropriate at this time, section 1385.1 did not prevent the trial court's action. Third, he argues that

---

[9]    Section 1260 provides: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

[10]    Defendant claims the state could not file a separate appeal of this issue pursuant to section 1238.

20

permitting the People to obtain review under section 1252 would violate his due process rights. For the reasons below, none of this is persuasive.

Section 1252 is broadly worded and allows an appellate court, on appeal by a defendant, to "consider and pass upon *all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General.*" (Italics added.) Contrary to defendant's position, the statutory language does not suggest that section 1252 may be used only when writ relief has been sought and denied. Nor has any decision so held.

While there is some merit to the contention that section 1252 should be subject to reasonable limitations, our application of the statute in this case is essentially consistent with its application in *People v. Braeseke* (1979) 25 Cal.3d 691. There, the trial court suppressed the defendant's first confession to police but admitted the rest of the challenged evidence against him. (*Id.* at pp. 697-698.) On appeal, the defendant contended that the admitted evidence should have been excluded because it was the product of the first confession, which was suppressed as unlawfully obtained. After noting the People could not have appealed the order suppressing the first confession, *Braeseke* determined it would be "patently unreasonable" to bar the People from seeking its review under section 1252, because if the trial court erred in ruling the first confession was inadmissible, it would follow that the challenged evidence was admissible even though based upon erroneous reasoning. (*Braeseke*, at p. 700.) Accordingly, *Braeseke* concluded that "the People may, on an appeal by the defendant and pursuant to the provisions of section 1252, obtain review of allegedly erroneous rulings by the trial court *in order to secure an affirmance of the judgment of conviction.*" (*Id.* at p. 701, italics added, fn. omitted.)

Consistent with *People v. Braeseke*, *supra*, 25 Cal.3d 691, we hold that section 1252 permits the People to seek review and correction of a trial court's

21

erroneous striking of a special circumstance in a capital appeal. We do so because defendant's narrower interpretation of the statute could lead to the invalidation of a death judgment if this court or a federal court were to conclude, for whatever reason, that other non-struck special-circumstance findings in a case cannot stand, or that the invalidity of one or more special circumstances in such a case would require reversal of a death judgment. When the evidence and the law support a struck special-circumstance finding, allowing the People to seek review of a trial court's clear violation of section 1385.1 will help ensure that a defendant's death judgment will not be set aside for any error unless "a miscarriage of justice" has occurred. (Cal. Const., art. VI, § 13.) Accordingly, we conclude that the People's failure to separately appeal or petition for writ review of the erroneous striking of the lying-in-wait special circumstance stands as no bar to our consideration of the matter, or to the exercise of our statutory power under section 1260.

Defendant contends that, even if review is appropriate at this time, section 1385.1 is intended to prevent a court from striking a jury's special circumstance finding only when the striking would alter the defendant's sentence. Here, he emphasizes, the death sentence remained unaffected by the court's action. We are not convinced.

The language of section 1385.1 is unambiguous in the breadth of its application: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." Defendant's proposed limitation, which finds no

22

support in the statutory language or in the ballot materials pertaining to its enactment, must be rejected.[11]

Defendant next contends that application of section 1252 would violate his due process rights. This contention, however, is based on the erroneous assumption that the statute does not authorize review where, as here, the People first sought review of trial court's action in the respondent's brief. Indeed, any issue raised pursuant to section 1252 is, by its nature, properly raised in the respondent's brief. Moreover, defendant's opening brief cited section 1385.1 with respect to the trial court's striking of the lying-in-wait special circumstance; therefore, he cannot claim surprise or late notice regarding this purely legal issue. Defendant also seems to have anticipated controversy concerning the trial court's action, for he fully briefed the issue whether sufficient evidence supported the lying-in-wait special circumstance.

Finally, defendant argues that if section 1385.1 deprived the trial court of authority to strike the lying-in-wait special circumstance under section 1385, the matter should be remanded to allow that court to address its concerns pursuant to section 190.4 or section 1181,[12] or under compulsion of the state and federal

---

**11** Defendant bases his interpretation on *Tapia v. Superior Court* (1991) 53 Cal.3d 282. *Tapia* stated in a footnote that section 1385.1 "appears to be a direct response to our opinion in *People v. Williams* (1981) 30 Cal.3d 470," in which we held that a trial court had power to dismiss a special circumstance finding in order to modify the particular defendant's sentence of life imprisonment without the possibility of parole. (*Tapia*, at pp. 298-299, fn. 17.) Even if *Tapia* was correct in noting that *Williams* prompted the enactment of section 1385.1, there appears no basis for restricting the statute's application to the context at issue in *Williams*.

**12** As relevant to defendant's contentions, section 190.4, subdivision (e), provides that in every case where a death verdict is rendered, the trial court must review the evidence and determine "whether the jury's findings and verdicts that

*(footnote continued on next page)*

Constitutions. We see no basis for a remand. Among other things, our determination that sufficient evidence supports the lying-in-wait special circumstance means that the trial court would have no statutory or constitutional basis for modifying the verdict or ordering a new trial based on the perceived insufficiency of such evidence.

Having concluded that the trial court had no authority to strike a special circumstance, we reinstate the lying-in-wait special circumstance pursuant to our statutory power under section 1260.

### C. Absence of Instruction Requiring Unanimous Agreement on Theory of Murder

The trial court did not instruct the jury that it had to unanimously agree on which if any statutory form of murder he committed (premeditated and deliberate or lying in wait). Relying on *Schad v. Arizona* (1991) 501 U.S. 624 and *Richardson v. United States* (1999) 526 U.S. 813, defendant contends the failure to do so was error and violated his state and federal constitutional rights to due process, to have the state establish proof of first degree murder beyond a reasonable doubt, and to a reliable guilt determination.

We have repeatedly rejected this identical contention (e.g., *People v. Russell*, *supra*, 50 Cal.4th at pp. 1256-1257; *People v. Cole* (2004) 33 Cal.4th 1158, 1221; *People v. Edwards*, *supra*, 54 Cal.3d at p. 824), and defendant offers no persuasive basis on which to revisit our conclusions.

---

*(footnote continued from previous page)*

the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." Section 1181, paragraph 6, provides that the trial court may grant a defendant's application for a new trial "[w]hen the verdict or finding is contrary to law or evidence . . . ."

**D. Sufficiency of the Evidence Supporting the Special Circumstance Allegations of Murder of a Police Officer and Murder to Avoid a Lawful Arrest**

At the close of the prosecution's case-in-chief, defendant challenged the sufficiency of the evidence supporting the special circumstance allegations of murder of a police officer (§ 190.2, subd. (a)(7)) (section 190.2(a)(7)) and murder to avoid a lawful arrest (§ 190.2, subd. (a)(5)) (section 190.2(a)(5)). Relying on section 1118.1, defendant moved to strike these two special circumstances on the ground that, as a matter of law, Officer Fraembs was not acting lawfully in performing his duties when he was killed.[13] The trial court denied defendant's motion, and also overruled his objection to the applicable jury instructions. (See CALJIC Nos. 8.81.5, 8.81.7, 8.81.8.) On appeal, defendant maintains the evidence was insufficient to prove that Fraembs's exercise of his duties was lawful.

In ruling on a section 1118.1 motion, the trial court applies the same standard used by the appellate court " ' "in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' " [Citation.] "The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case."

---

[13] Strictly speaking, section 1118.1 provides that a defendant may move for "a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." The People contest the merits of defendant's motion, but do not contend the motion cannot be used to strike special circumstance allegations. Accordingly, we shall the analyze his claim under that code section. (Accord, *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 160-161 & fn. 18.)

[Citations.] The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review.' (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)" (*People v. Lynch* (2010) 50 Cal.4th 693, 759.)

### 1. Police Officer Murder: Lawful Exercise of Duties

As relevant here, section 190.2(a)(7) provides that a defendant is eligible for the death penalty when "[t]he victim was a peace officer . . . who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or her duties . . . ." For purposes of this statute, "engaged in the course of the performance of his or her duties" means the officer must have been acting lawfully at the time the offense was committed. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020 [officer's conduct must be objectively lawful, but defendant need not subjectively understand its legality]; *People v. Mayfield* (1997) 14 Cal.4th 668, 791; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1218-1221.) This special circumstance serves "to afford special protection to officers who risk their lives to protect the community." (*Jenkins*, at p. 1021.)

Here, the prosecution presented testimonial and physical evidence that established the following. Officer Fraembs was in full uniform and driving in his marked patrol car at 1:30 a.m., when he saw two males and one female walking on a lonely industrial street. Defendant was dressed in black pants with a black bomber-style jacket, and Sparky wore a baggy T-shirt and baggy pants with a

26

knife sheath attached to his belt.[14] Although Fraembs was not alive to explain why he chose to make contact with the three pedestrians, certain inferences were reasonably drawn from the evidence. As the prosecution reasoned in its closing argument to the jury, "It is 1:30 in the morning and [Fraembs] elected to find out what is going on with these three people. . . . Are these three motorists that have been stranded and are looking for help? Is this female who is in the presence of the two males, is she involuntarily in their company? Are these three people who are lost? Are these three people suspects who are looking for a vehicle to burglarize or perhaps a business to burglarize because, remember, this is an industrial street. [¶] Officer Fraembs doesn't know."

Consistent with the theory that Officer Fraembs may have thought the three needed help, Johanna Flores testified that Fraembs was "real nice" when he asked, "How are you guys doing tonight?" Flores seemed untroubled by the officer's approach, thinking the stop might have been "for curfew check, nothing major." What happened next was significant. Although Fraembs asked his question in a friendly and nonaccusatory manner, the male who was a "lot taller" than Fraembs responded with "an attitude," saying something like, "What the hell are you stopping us for" or "What are you stopping us for." That male was defendant, who in Flores's words was acting "rude" and being "a jerk." The other male had a knife sheath hanging from his belt.[15] Again, Fraembs was not alive to explain his

<hr>

[14] Police discovered a knife in the vicinity in which Sparky was found after the murder. The knife fit into Sparky's sheath.

[15] At the hearing on defendant's motion to strike, the trial court stated its belief that Officer Fraembs observed the knife and knife sheath on Sparky's person, and that Fraembs "apparently was looking to see what weapons, if any, Sparky had, in addition to a knife that might hurt him . . . ." Substantial evidence supported that belief as well as the court's decision to submit the matter to the

*(footnote continued on next page)*

27

actions, but Flores testified that, at that juncture, he told defendant and Flores to "have a seat right there" on the curb. Fraembs called Sparky, the male nearest to him, with the baggy clothes and knife, over to the patrol car. Sparky put his hands on the hood, and Fraembs stood behind him and started conducting a patsearch.

The question is whether, on this record, the evidence was sufficient to prove that Officer Fraembs was acting lawfully when he was killed. For the reasons below, we conclude the answer is yes.

As defendant concedes, Officer Fraembs initiated a lawful consensual encounter when he approached defendant and his companions to ask how they were doing. (See *Florida v. Royer* (1983) 460 U.S. 491, 497 ["law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place" or "by putting questions to him if the person is willing to listen"]; *People v. Hughes* (2002) 27 Cal.4th 287, 328 [consensual encounter found where officer approached the defendant at a crime scene, "inquired whether he could assist him, and posed basic and preliminary questions" in a nonaccusatory and routine manner to establish whether the defendant might possess information concerning the crime].) Defendant, however, contends the consensual encounter ripened into an illegal detention when Fraembs directed Flores and him to take a seat on the curb and ordered Sparky to the patrol car for a patsearch.

---

*(footnote continued from previous page)*

jury, including photographic evidence showing that, when the police found Sparky just after the murder, a knife sheath hung from his belt. On appeal, of course, we presume in support of the judgment the existence of every fact the trier of fact could reasonably have deduced from the evidence. (*People v. Moon*, *supra*, 37 Cal.4th at p. 22.)

Unlike a consensual encounter, a detention is a seizure within the meaning of the Fourth Amendment of the United States Constitution; a seizure occurs when an officer restrains a person's liberty by force or show of authority. (*People v. Glaser* (1995) 11 Cal.4th 354, 363, and cases cited.) A consensual encounter may turn into a lawful detention when an individual's actions give the appearance of potential danger to the officer. (*People v. Rosales* (1989) 211 Cal.App.3d 325, 330.) "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry v. Ohio* (1968) 392 U.S. 1, 27; see *Glaser*, at p. 366; *In re H.M.* (2008) 167 Cal.App.4th 136, 143.) There is no question that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime." (*Terry v. Ohio*, at pp. 26-27.) But because protection of the officer and others nearby is the sole justification, the search must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (*Id*. at p. 29; see *In re H.M.*, at p. 143.)

We conclude the prosecution's evidence was sufficient to support a finding that Officer Fraembs was acting lawfully when he detained defendant and his companions to conduct a patsearch for weapons. As the record reflects, what began as a consensual encounter turned into a potentially threatening situation for Fraembs when defendant reacted to his friendly approach in a hostile manner. It was the middle of the night, and Fraembs was a lone officer outnumbered by three people, including one confrontational, much taller male and a second male wearing a knife in a sheath. Both males were wearing clothing loose enough to conceal other weapons, and there was no one in the immediate vicinity who might

offer assistance. Such evidence amply supports the conclusion that, *at that point*, sufficient grounds supported Fraembs's decision to temporarily detain the three individuals to check for other weapons. (See *People v. Rosales*, *supra*, 211 Cal.App.3d at p. 330.)

Defendant disagrees and contends the photographic evidence showed that Sparky's knife sheath might not have been visible under his loose-fitting T-shirt. That, however, was a question for the trier of fact. (See *ante*, fn. 15.) But even assuming Fraembs did not know if any of the three were armed, it remains the case that he did not draw his gun, use his baton or handcuffs, or arrest anyone. Instead, Fraembs apparently decided a limited detention to conduct a patsearch was a sufficient precautionary measure for his safety, and he started with the male who was closest to him. This was perfectly appropriate. The totality of the circumstances gave rise to a reasonable apprehension of danger on the officer's part, and the detention and patsearch were reasonably designed to discover weapons. (*Terry v. Ohio*, *supra*, 392 U.S. at p. 29; *In re H.M.*, *supra*, 167 Cal.App.4th at p. 143.)

Because the evidence supports the conclusion that Officer Fraembs acted in accordance with the Fourth Amendment, the trial court properly denied defendant's motion to strike the section 190.2(a)(7) special-circumstance allegation and related instructional objections.

### 2. *Murder to Avoid Lawful Arrest*

As relevant here, section 190.2(a)(5) provides that a defendant is eligible for the death penalty when "[t]he murder was committed for the purpose of avoiding or preventing *a lawful arrest* . . . ." (Italics added.) Emphasizing the italicized language, defendant contends this special circumstance should have been struck because any arrest occurring during Officer Fraembs's unlawful detention

30

also would have been unlawful, and therefore outside the scope of the statute. As explained, however, the prosecution's evidence supported the lawfulness of the detention. That being the case, the evidence was sufficient to establish that defendant would have been subject to a lawful arrest if Fraembs had discovered his loaded, concealed weapon during the course of that detention.

Defendant's motion to strike the special circumstance allegation of murder to avoid lawful arrest was correctly denied, and his related instructional objections were properly overruled.

### E. Evidence of Threats

Defendant contends the trial court committed reversible error by improperly admitting evidence of threats made to three witnesses and evidence of Johanna Flores's relocation, as well as by excluding testimony that Flores had threatened defendant several weeks before the shooting. He claims the erroneous evidentiary rulings undermined the integrity of his trial and violated his state and federal constitutional rights to a fair trial, confrontation of witnesses, due process, effective assistance of counsel, and a reliable and nonarbitrary sentencing process.

#### 1. *"Third Party" Threat Against Flores*

Flores testified at the preliminary hearing that she called defendant the morning after the shooting. Defendant's brother Angel answered and told her, "I thought you were dead." When Flores asked why, Angel replied, "That's what we do to *jaina*[*s*] who see things, who see things they should not see."[16] At trial, the prosecutor contended Flores should be permitted to testify about this conversation because Angel's threat was relevant to her state of mind and credibility. Although

---

[16]    "*Jaina*" apparently is a Spanish slang term for "girl" or "girlfriend."

31

defense counsel acknowledged that Flores had been "scared from Day One," he argued that Angel's statements did not constitute a direct threat to Flores, that the evidence was inadmissible hearsay, and that it should be excluded under Evidence Code section 352.

After taking a recess to consider the matter, the trial court ruled it would allow the prosecution to elicit testimony from Flores that she felt threatened by defendant and Angel, and was afraid to testify. The court ruled, however, that the particular statement by Angel — referring to "*jaina*[*s*] . . . who see things they should not see" — would not be allowed, subject to reconsideration of the ruling in the event Flores recanted or her memory became selective.[17] Thereafter, Flores testified that Angel said something threatening to her the morning after the shooting, causing her to feel "really scared" at the time. Flores also testified the police relocated her entire family at her request.

Evidence Code section 780 provides in relevant part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive. [¶] . . . [¶] (j) His attitude toward the action in which he testifies or toward the giving of testimony." As we have recognized, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that

---

**17**    The court ruled, however, that Flores could testify regarding any threatening statements defendant himself had made to her. Consistent with this ruling, Flores testified that after Officer Fraembs's shooting, defendant pointed his gun at her and twice asked if she was going to say anything. Flores took defendant's action seriously, and each time responded that she did not see, hear, or know anything.

witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869; see *People v. Valencia* (2008) 43 Cal.4th 268, 302.) Moreover, evidence of a "third party" threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1142; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 (*Olguin*).)

*Olguin*, *supra*, 31 Cal.App.4th 1355, is instructive. There, an eyewitness to a gang-related shooting testified he left the crime scene and did not voluntarily provide information to the police because " 'I didn't want anything to happen to my house or to my family.' " (*Id*. at p. 1368.) Over the defendants' objection, the witness testified that someone telephoned him a few days after the shooting, that the caller said they knew where the witness lived and he had better watch his back, and that the caller also mentioned the name of the defendants' gang. The witness further testified that someone subsequently "spray-painted the word 'Rata' (Spanish for 'rat') on his driveway." (*Ibid*.) In holding the challenged evidence was properly admitted, *Olguin* explained: "Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility. For this purpose, it matters not the source of the threat. It could come from a friend of the defendant, or it could come from a stranger who merely approves of the defendant's conduct or disapproves of the victim. . . . [¶] Regardless of its source, the jury would be entitled to evaluate the witness's testimony *knowing* it was given under such circumstances. And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352,

33

those facts which would enable them to evaluate the witness's fear. A witness who expresses fear of testifying because he is afraid of being shunned by a rich uncle who disapproves of lawyers would have to be evaluated quite differently than one whose fear of testifying is based upon bullets having been fired into her home the night before the trial." (*Id*. at pp. 1368-1369.)

Likewise, in *People v. Avalos* (1984) 37 Cal.3d 216 (*Avalos*), an eyewitness to a crime hesitated before responding affirmatively when asked by the prosecutor whether the person she previously identified in a lineup (i.e., the defendant) was in the courtroom. (*Id*. at p. 232.) At an in camera hearing, the trial court ruled the prosecution might ask whether the witness was reluctant to testify out of fear, because "the fact she felt fear, whether or not caused by specific acts of any persons connected with the trial, was relevant to her credibility and . . . the probative value outweighed any potential prejudice to defendant." (*Ibid*.) Upon resuming the stand, the witness testified she was afraid to testify. Defense counsel then clarified during cross-examination that the witness's fear was due only to the importance of the event. (*Ibid*.) On appeal, we concluded the evidence was properly admitted: "The determination that an explanation of [the witness's] hesitation would be relevant to the jury's assessment of her credibility was well within the discretion of the trial court." (*Ibid*.) Moreover, the evidence had no prejudicial impact given counsel's clarification that the witness's fear did not reflect on the defendant. (*Ibid*.)

These authorities make clear that a trial court has discretion, within the limits of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a witness's credibility on direct examination, particularly when the prosecution reasonably anticipates a defense attack on the credibility of that witness. That is what happened here. Flores was the prosecution's key witness, and the credibility of her testimony was essential to establish defendant's

34

guilt of the charged crimes and the truth of the special circumstance allegations. As the People point out, the defense signaled a strategy of challenging Flores's credibility as early as the preliminary hearing, when it questioned Flores regarding her gang affiliations, her drug and alcohol use, her sex life and her jealousy toward defendant's relationship with Valore, and her fights with defendant. Thus at trial, the prosecution was keenly aware of the possibility that the jurors would believe, as the defense later sought to establish through cross-examination of Flores and Meyers and during closing argument, that Flores was a jealous, foul-mouthed, drug-abusing, "hard-core home girl gang banger" who was wrongfully accusing defendant of murder because of his relationship with Valore. Under these circumstances, the trial court properly allowed the prosecution to support Flores's credibility by eliciting her direct examination testimony that she became fearful after speaking with Angel the morning after the shooting.

Defendant maintains that none of Flores's testimony on the point was admissible because she never recanted her testimony nor were there substantial inconsistencies in it.[18] To support this position, he relies on *People v. Brooks* (1979) 88 Cal.App.3d 180, which purported to hold that a witness's testimony concerning a threat she received was irrelevant because the witness gave no inconsistent testimony before the threat testimony was elicited. According to *Brooks*, the absence of any prior inconsistent testimony on the part of that witness meant "there was no issue of credibility," thus rendering "the 'threat' evidence . . . immaterial to any issue and irrelevant to the case." (*Id*. at p. 187.)

We are not persuaded by *Brooks* for several reasons. First, *Brooks* cited no authority for the proposition that inconsistent testimony is a prerequisite to the

---

[18]    Defendant concedes Flores's trial testimony contradicted her earlier statements, but argues the inconsistencies were insubstantial.

35

admission of evidence of a third party's threat or a witness's fear, and such a proposition finds no support in the terms of Evidence Code section 780. Second, as other authorities explain, evidence that a witness testifies despite fear is important to fully evaluating his or her credibility. (E.g., *Olguin*, *supra*, 31 Cal.App.4th at p. 1369.) The logic of this rationale does not hinge on whether the witness gave prior inconsistent testimony. Third, *Brooks* is contrary to decisions of this court that have recognized the relevance of such evidence when inconsistent testimony was not at issue. (E.g., *People v. Valencia*, *supra*, 43 Cal.4th at pp. 301-302; *People v. Dickey* (2005) 35 Cal.4th 884, 912-913; *People v. Sapp* (2003) 31 Cal.4th 240, 280-281; *People v. Warren* (1988) 45 Cal.3d 471, 481; *Avalos*, *supra*, 37 Cal.3d at p. 232; *People v. Green* (1980) 27 Cal.3d 1, 19-20; accord, *Olguin*, *supra*, 31 Cal.App.4th at pp. 1368-1369.)[19]

Finally, defendant claims that the trial court "completely ignored the question of whether the prejudicial effect of the evidence outweighed its probative value" and that it failed to rule on his Evidence Code section 352 objection. This claim is contradicted by the record, which discloses the court took a recess for the express purpose of considering several issues pertaining to Flores's testimony, including this particular one. Upon reconvening, the court discussed the parties' authorities and fashioned a ruling that recognized the relevance of Angel's threats and at the same time addressed defendant's concerns regarding prejudice.[20]

---

[19] *People v. Brooks*, *supra*, 88 Cal.App.3d 180, is hereby disapproved to the extent it is inconsistent with the views expressed herein.

[20] The court stated it would permit Flores's testimony that Angel said something threatening to her, but would exclude evidence of Angel's actual words unless Flores recanted or exhibited selective memory in her trial testimony. Defendant, however, did not request a limiting instruction with regard to the

*(footnote continued on next page)*

36

Contrary to defendant's suggestion, the evidence of Angel's threat was not cumulative to the evidence that defendant threatened Flores at the scene of the crime; nor was it unduly prejudicial. Accordingly, admission of the evidence was not erroneous under Evidence Code section 352.

## 2. *Third Party Threats Against Arambula and Silva*

Defendant next contends the trial court erred by admitting evidence that (1) Elva Arambula became frightened by a threat she received following her preliminary hearing testimony, and (2) Joseph Silva became frightened after a Happy Town gang member named Casper told him to keep his mouth shut and said his entire family would be killed if he testified that defendant had admitted shooting a cop.

Arambula and Silva both gave testimony that was inconsistent with their earlier statements in certain respects.[21] On appeal, defendant and the People dispute whether the inconsistencies were substantial or minor. Regardless of this disagreement, the testimony was properly admitted. As discussed, evidence that a

---

*(footnote continued from previous page)*

evidence of Angel's threat, so the trial court was not obligated give one. (*People v. Sapp*, *supra*, 31 Cal.4th at p. 301.)

Moreover, the court was not required to explicitly state it was engaging in the Evidence Code section 352 weighing process when it fashioned its order. (*People v. Rowland* (1992) 4 Cal.4th 238, 259, fn. 1 [record must affirmatively show the trial court weighed prejudice against probative value, but court need not expressly state it did so].)

[21] The inconsistency involving Arambula concerned her account of the direction in which defendant and Flores were walking when the two groups parted before the shooting occurred. The inconsistency involving Silva pertained to his testimony that he could have told the police that defendant said he had used the gun Silva purchased "to kill a cop," but that this was "not the way it happened."

37

witness is afraid to testify or fears retaliation for testifying is relevant to that witness's credibility (*People v. Burgener*, *supra*, 29 Cal.4th at p. 869; Evid. Code, § 780), and may be admissible whether or not the threat is directly linked to the defendant (see *People v. Guerra*, *supra*, 37 Cal.4th at p. 1142; *Olguin*, *supra*, 31 Cal.App.4th at p. 1368.) As also explained, recantation or inconsistent testimony is not a prerequisite for the admission of evidence of a third party's threat or a witness's fear, although here such evidence might have explained the witnesses' inconsistent accounts of events (see *ante*, fn. 21) and Silva's demeanor while testifying.[22] This contention is rejected.

Defendant next contends that Evidence Code section 352 required exclusion of these third party threats. We disagree. Not only was the evidence relevant to each witness's credibility, but any potential for prejudice was eliminated by the trial court's express instructions that the jury was to consider such evidence for the sole purpose of determining the credibility of these witnesses. Moreover, the court allowed the parties to clarify that the threat against Arambula had not been made by defendant.[23]

---

[22] Although Silva denied being afraid during the prosecution's direct examination, he apparently was a reluctant witness and testified with his back toward defendant.

[23] Defendant additionally contends that, whether or not the claimed errors were prejudicial at the guilt phase, they adversely affected the penalty determination, particularly with regard to the evidence in aggravation concerning the beating of Ryan Schultz, whose car was shot up. In this regard, defendant notes that Schultz testified he did not initially tell the police what happened because he feared defendant's gang. Having concluded that admission of the threat evidence was not error at all, we reject this penalty phase claim as meritless.

38

### 3.  *Alleged Atmosphere of Fear*

Defendant complains the erroneous admission of the alleged threats and testimony regarding witnesses' fear created an atmosphere of fear among the jurors such that he was deprived of his constitutional rights to due process and a fair trial.  To prove his point, defendant identifies one instance in which some of the jurors approached the bailiff about a spectator in court who, even though he had not said or done anything, made them feel "uncomfortable."  Defendant also notes that another time, a juror told the court he was worried that a newspaper photographer had taken his picture.

Defendant forfeited review of this constitutional claim by failing to raise it at trial.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1201; see *People v. Williams* (1997) 16 Cal.4th 153, 208-209.)  Even assuming it was properly preserved, we would find it lacking in merit.  As discussed above, the evidence of third party threats and the witnesses' fear was relevant on the issue of witness credibility.  The questioning and closing argument concerning such evidence was brief and noninflammatory, and limiting instructions were given as requested.

Although some jurors initially expressed concern about the courtroom spectator and newspaper photographer, the record reflects that the trial court immediately addressed each concern to the apparent satisfaction of the jurors.[24]

---

**24**      With regard to the courtroom spectator, the court discussed the matter with the parties and thereafter told the jury:  "One thing I wanted to talk to you about very briefly:  some of you had expressed concern as to a spectator that was in the courtroom and this concern was expressed to the bailiff.  Our information is that that person is a citizen in the community, that he is a spectator.  All of you know that courtrooms are open to the public and they are free to come in to view at any time they may wish to.  It's our belief that there is no reason for anyone to be concerned about that person.  If that should change, we will inform you.  I don't believe there is anything to be concern[ed] about."  To the extent the presence of

*(footnote continued on next page)*

Whether considered individually or together, these incidents did not reflect an atmosphere of fear that deprived defendant of due process or a fair trial.

In sum, defendant fails to establish that any error occurred, much less one of constitutional dimension.

### 4. *Flores's Threat Against Defendant*

After the prosecution concluded its direct examination of Jason Meyers, the defense asked the trial court to allow Meyers to testify he heard Flores tell defendant, about a month and a half before the shooting, that she could have defendant "taken out" by "Cherryville." The prosecution vigorously objected, arguing in part that the evidence was more prejudicial than probative and that Flores, who had concluded her testimony but was subject to re-call, should have been given the opportunity to deny or explain the alleged threat. The court agreed that Flores's relationship and general demeanor with defendant in the two weeks leading up to the shooting would be relevant to show any bias or motive she might have to testify falsely against defendant, but concluded that the alleged threat was too remote to be relevant and excluded the testimony. Specifically, the court rejected defense counsel's argument that Flores's threat to have defendant taken out by members of a rival gang would be relevant to show she might be willing to

---

*(footnote continued from previous page)*

the particular spectator in the courtroom initially worried some jurors, the record shows no continued concern after the court's statements.

The incident involving the newspaper photographer involved only one juror, who informed the court he was behind the victim's mother and a police officer when he was photographed. The court ordered production of all the photographs taken, and ascertained the juror had in fact appeared in a single unpublished photograph. The court ordered that the photograph and negative be destroyed, and that the newspaper not publish any photograph in which a juror appeared.

wrongly accuse defendant out of intense hatred and bias.  On appeal, defendant contends the court's exclusion of the alleged threat was contrary to state law and also deprived him of his federal constitutional rights to present his defense and to due process and a fair trial.  We disagree.

Under Evidence Code section 352, a trial court has "broad power to control the presentation of proposed impeachment evidence ' " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" ' [Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 195.) " '[W]e have repeatedly held that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." [Citation.]' [Citations.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1292.)  "On appeal, we evaluate the court's ruling by applying an abuse of discretion standard." (*Mills*, at p. 195.)

It bears mentioning that, by the time the issue of Flores's alleged threat arose, the jury had already heard substantial testimony concerning the stormy relationship between Flores and defendant, and specifically about Flores's anger and jealousy over defendant's interactions with other women.  Flores herself testified that she was angry at defendant for "screwing" and for maintaining a sexual relationship with Valore, and that she told defendant "[i]t's either Brandy or me."  Flores also acknowledged that, on the night of Officer Fraembs's shooting, she argued with defendant when he received a page from Valore while at Tank's house and got so mad she hit him.  As the two walked to meet Sparky, Flores was again angered when defendant asked a girl for a cigarette.  Meyers confirmed during his direct examination that Flores reacted to the cigarette request

41

by "getting all crazy with [defendant], hitting him and calling him names and cursing at him."

On this record, we cannot say the trial court abused its broad discretion in excluding evidence of Flores's alleged threat. First, the jury had already heard substantial evidence of Flores's potential bias or motive to lie, so the court could reasonably view Meyers's additional impeachment testimony as being of marginal value. (See *People v. Harris*, *supra*, 43 Cal.4th at p. 1292.) Second, the court could reasonably decide that the alleged threat would cause confusion or undue prejudice, given the significant difference between a jealous woman who threatens to have a rival gang "take out" her cheating boyfriend, and one who, several weeks following a capital murder, manipulates the criminal justice system with false accusations against the boyfriend to ensure his conviction of murder.[25] Third, the possibility that the prosecution would seek to re-call Flores to deny or explain the alleged threat, and the time such questioning would have consumed, also was a valid consideration.

We find no abuse of discretion under Evidence Code section 352. We also reject defendant's related constitutional claims. (*People v. Mills*, *supra*, 48 Cal.4th at p. 196 [routine application of state evidentiary law does not implicate a defendant's constitutional rights].)

## F. Evidence Regarding Defendant's Parole

Defendant challenges the trial court's rulings pertaining to his parole status and related matters.

---

[25] In the court's words, "I see a difference in kind between having Cherryville take you out and having the entire judicial system or the entire justice system put you out of commission, so to speak."

### 1. *Admission of Parole-related Evidence*

The trial court permitted the introduction of evidence that defendant was on parole from the CYA at the time of the shooting, that he was subject to a parole condition that he not possess a weapon, that he signed a form acknowledging the terms of his parole, and that he was on notice that a parole violation could result in his being returned to custody for 575 days, plus a possible additional year for the actual possession of a weapon. The court also allowed Flores to testify that, a month or two before the shooting, defendant had told her he was on parole and "didn't want to go back" or "couldn't go back" to jail. The prosecution relied on this evidence, as well as on statements defendant made the night of the shooting about his carrying a gun, to bolster its theory that defendant committed the willful, deliberate, and premeditated murder of Officer Fraembs in order to avoid arrest and a return to custody on a serious parole violation.

Defendant contends the evidence of his parole status and conditions and Flores's testimony on the point should have been excluded as more prejudicial than probative. Although defendant's Evidence Code section 352 objection to such evidence was overruled at a pretrial hearing in June 1997, the People assert the issue has not been preserved for review because that objection was deficient and the defense neglected to make appropriate objections during the trial testimony of Flores and of defendant's parole officer. No matter. The claim is handily rejected on the merits.

For purposes of Evidence Code section 352, evidence is considered unduly prejudicial if it tends to evoke an emotional bias against the defendant as an individual and has a negligible bearing on the issues. (*People v. Padilla* (1995) 11 Cal.4th 891, 925.) Put another way, evidence should be excluded " ' "when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to

reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)" (*People v. Howard* (2010) 51 Cal.4th 15, 32.)

Here, the evidence of defendant's parole status and his awareness of the consequences he faced if arrested for carrying a gun was highly probative of his mental state and motive at the time of the shooting. (See *ante*, pt. II.A.2.) Defendant's statement to Flores that he "didn't want to go back" or "couldn't go back" to jail was probative for the same reason, and the circumstance that it might have been uttered a month or two before the shooting did not render the evidence irrelevant, or too remote or unreliable. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1173 [that witness's conversation with defendant occurred three years before defendant's commission of robbery and murder affected the weight of the evidence, not its admissibility]; *People v. Douglas* (1990) 50 Cal.3d 468, 511 ["remoteness of evidence goes to its weight and not to its reliability"].)

At the same time, none of this evidence was inflammatory or substantially likely to elicit an impermissible emotional response from the jury. Evidence that defendant was on parole from a juvenile detention center and did not want to go back was not so emotionally charged as to inhibit its logical evaluation by the jury. Nor would the evidence, by virtue of its nature, have prompted the jury to punish defendant. No abuse of discretion appears.

### 2. *Exclusion of Prior Parole Violation*

When the court was considering whether to admit the parole-related evidence, defense counsel referred to evidence that a month before Officer Fraembs's shooting, defendant was tested for drugs by his parole officer and was

44

found "positive for methamphetamine." Counsel also indicated that defendant had previously admitted drug use to his parole officer, who then advised defendant to "clean up" before the drug test. Asserting this was "strong corroborative circumstantial evidence" that defendant "might have been under the influence of methamphetamine at the time he shot [Fraembs]," counsel argued the evidence should "come in for that purpose." The court disagreed, concluding the evidence was speculative on the issue because the positive drug test would not have established that defendant was under the influence a month later when he shot Fraembs, and no witness who observed defendant on the evening in question described him as acting under the influence.

Defendant does not argue the court's ruling was erroneous on the basis described above. Instead, he characterizes his admissions of drug use and his positive drug test as evidence that a prior violation of a parole condition did not result in a parole revocation or return to custody. Excluding this evidence was error, he claims, because it would have rebutted the prosecution's claim that he shot Officer Fraembs to avoid arrest for carrying a gun in violation of parole. We reject this claim for the following reasons.

First, a fair reading of the record discloses that defendant neglected to advance this theory of admissibility at trial. Procedurally, then, the issue has not been preserved for review. (Evid. Code, § 354; *People v. Ervine* (2009) 47 Cal.4th 745, 779.)

Second, even assuming the evidence should have been admitted, its absence was harmless. Evidence that defendant's parole was not revoked on the basis of his admissions of drug use and the single positive drug test would have done little to prove defendant's lack of concern that his parole could and would have been revoked for the much more serious violations of carrying a loaded, concealed weapon in the company of Sparky, a gang member (knowingly associating with

45

gang members was a separate parole violation). Indeed, defendant specifically fretted over his gun carrying more than once the evening of the shooting. Not only did defendant say he did not want to get "busted" for being "strapped" when meeting Sparky at the railroad tracks, but defendant's immediate reaction when Officer Fraembs pulled up behind them was to say, "Oh, shit, the [cops]" and "Oh, shit. I got the gun." On this record, it is not reasonably probable that admission of the proffered evidence would have garnered a more favorable result for defendant. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 3. Failure to Give Limiting Instruction

Defendant next contends the trial court erred by failing to give CALJIC No. 2.50, which instructs the jury as to the limited use of other-crimes evidence. Although defense counsel indicated at a pretrial hearing that he would request this instruction if the jury were to hear about the crimes defendant committed as a juvenile, it appears counsel did not do so in light of certain changed circumstances at trial.[26]

Generally, a court is not required to instruct sua sponte on the limited admissibility of evidence of a defendant's prior crimes. (See *People v. Padilla*, *supra*, 11 Cal.4th at p. 950; *People v. Morris* (1991) 53 Cal.3d 152, 214; *People v. Collie* (1981) 30 Cal.3d 43, 63.) Notwithstanding this general rule, we have

[26]    At the pretrial hearing, defense counsel said that if the prosecution were to introduce evidence of defendant's parole status to prove mental state and motive, counsel would seek to show that defendant had committed a juvenile commercial burglary so the jury would not speculate why he was on parole, and to then submit CALJIC No. 2.50 to limit the jury's consideration of the matter. After learning from defendant's parole officer that defendant had in fact been on parole for residential burglary and for assaulting a school officer, counsel informed the court he would not introduce such evidence at trial. When Flores and defendant's parole officer testified concerning defendant's parole status, counsel did not ask them about the prior offenses and made no request for a limiting instruction.

recognized the possibility there might be "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence." (*Collie*, at p. 64.)

This case does not present the type of "extraordinary" situation contemplated in *People v. Collie*, *supra*, 30 Cal.3d 43. As explained, the evidence of defendant's parole status and parole conditions was highly relevant to the central issue of defendant's mental state and intent with regard to both the first degree murder count and the charged special circumstances. At the same time, it was not inflammatory and "there was little, if any, danger that the jury would consider such evidence for any . . . improper purposes . . . including general criminal disposition." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1226.)[27] Consequently, no sua sponte instruction was required.

Because there is no merit to any of the foregoing evidentiary and instructional claims of state law error, it follows that the claimed errors did not violate his state and federal constitutional rights to due process and a fair trial.

### G. CALJIC No. 2.51

With defendant's agreement, the trial court instructed the jury pursuant to CALJIC No. 2.51, as follows: "Motive is not an element of the crime charged and

---

[27]   Defendant complains the need for CALJIC No. 2.50 was particularly acute because the jury was told he was a gang member and likely surmised his parole status was associated with gang activity. As indicated, however, it was the defense's decision to refrain from asking the witnesses about the crimes that led to defendant's parole status.

need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish the defendant is guilty.  Absence of motive may tend to show the defendant is not guilty."

Notwithstanding his acquiescence at trial, defendant complains on appeal that CALJIC No. 2.51 fails to adequately instruct that motive alone is insufficient to establish guilt,[28] that the instruction impermissibly lessens the prosecution's burden of proof with regard to the element of intent, that it shifts the burden of proof to defendants to prove their innocence, and that its use violated his state and federal constitutional rights to due process, a fair jury trial, and reliable guilt and penalty determinations.  We reject these claims, as we have before (e.g., *People v. Tate* (2010) 49 Cal.4th 635, 699; *People v. Friend* (2009) 47 Cal.4th 1, 53; *People v. Wilson*, *supra*, 43 Cal.4th at p. 22; *People v. Cleveland*, *supra*, 32 Cal.4th at p. 750), and see no reason to revisit their merits.

### H.  CALJIC Nos. 2.02, 2.21.2, 2.22, 2.27, 8.20

Defendant contends the trial court gave several instructions that undermined the requirement of proof beyond a reasonable doubt in violation of his constitutional rights to due process, trial by jury, and a reliable guilt verdict: CALJIC Nos. 2.02, 2.21.2, 2.22, 2.27, and 8.20.

As defendant acknowledges, we have previously rejected such contentions as to all the instructions cited.  (E.g., *People v. Tate*, *supra*, 49 Cal.4th at pp. 697-698; *People v. Hartsch* (2010) 49 Cal.4th 472, 506; *People v. Friend*, *supra*,

---

[28]    To the extent this claim merely concerns the clarity of the instruction, it is not cognizable on appeal given defendant's failure to request clarification at trial. (*People v. Wilson* (2008) 43 Cal.4th 1, 22; *People v. Cleveland* (2004) 32 Cal.4th 704, 750.)

47 Cal.4th at p. 53; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 220-221.)  We decline to reconsider our position.

### I.  Validity of the Lying-in-wait Special Circumstance

Defendant argues the lying-in-wait special circumstance, as interpreted by this court, violates the Eighth Amendment to the United States Constitution because it fails to adequately narrow the class of persons eligible for the death penalty and fails to provide a meaningful basis for distinguishing cases in which the death penalty is sought from cases in which it is not.  We have repeatedly rejected these same contentions.  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1310; *People v. Cruz* (2008) 44 Cal.4th 636, 678; *People v. Lewis* (2008) 43 Cal.4th 415, 515-516; *People v. Jurado* (2006) 38 Cal.4th 72, 127.)  We do the same here.

### J.  Challenges to California's Death Penalty Statute and Related Instructions

Defendant makes a number of challenges to the constitutionality of our state death penalty sentencing scheme and the jury instructions thereunder.  We have previously rejected all such challenges, as follows.

Contrary to defendant's assertions, section 190.3, factor (a), is not applied in such a "wanton and freakish" manner that it results in the arbitrary and capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  (*People v. Russell*, *supra*, 50 Cal.4th at p. 1274; *People v. Bennett* (2009) 45 Cal.4th 577, 630-631; *People v. Jenkins*, *supra*, 22 Cal.4th at pp. 1050-1053.)

"Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors."  (*People v. Jennings* (2010) 50 Cal.4th 616, 689.)  Moreover, jury

49

unanimity is not required with regard to unadjudicated criminal activity. (*People v. Dykes* (2009) 46 Cal.4th 731, 799.) There is no constitutional requirement that the jury find beyond a reasonable doubt that death is the appropriate punishment. (*People v. Carrington* (2009) 47 Cal.4th 145, 199-200; *People v. Romero* (2008) 44 Cal.4th 386, 428.) The Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Blakely v. Washington* (2004) 542 U.S. 296, and *Ring v. Arizona* (2002) 536 U.S. 584 have not altered these conclusions. (*Jennings*, at p. 689; *Carrington*, at p. 200; *Dykes*, at pp. 799-800.)

" 'The death penalty scheme is not unconstitutional because it fails to allocate the burden of proof — or establish a standard of proof — for finding the existence of an aggravating factor . . . . [Citations.]' " (*People v. Jennings*, *supra*, 50 Cal.4th at p. 689.) Nor was the trial court required to instruct the jury that there is no burden of proof at the penalty phase. (*Ibid*.) The federal Constitution does not require that the state bear some burden of persuasion at the penalty phase, and the jury instructions were not deficient in failing to so provide. (*People v. Russell*, *supra*, 50 Cal.4th at p. 1272; *People v. Friend*, *supra*, 47 Cal.4th at p. 89.) Defendant was not entitled to an instruction regarding a " ' "presumption of life." ' " (*Russell*, at p. 1272; see *People v. Ervine*, *supra*, 47 Cal.4th at p. 811.)

CALJIC Nos. 8.85 and 8.88 do not fail to provide the jury with the guidance legally required for administration of the death penalty to meet constitutional minimum standards. (*People v. Bramit* (2009) 46 Cal.4th 1221, 1248-1249, and cases cited.) More specifically, CALJIC No. 8.88's use of the phrase "so substantial," and of the term "warranted" instead of "appropriate," does not render the instruction impermissibly vague or ambiguous. (*People v. Russell*,

50

*supra*, 50 Cal.4th at p. 1273; *People v. Tate*, *supra*, 49 Cal.4th at p. 712.)[29] Where, as here, the jury is instructed in the language of CALJIC No. 8.88, the court need not further instruct that life without parole is mandatory if mitigation outweighs aggravation, or that life without parole is permissible even if aggravation outweighs mitigation. (*Tate*, at p. 712, and cases cited.)

Our standard penalty phase instructions do not call for jury unanimity on mitigating factors; nor do they mislead a jury into believing such unanimity is required. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 104.) Moreover, "[t]he trial court need not instruct that the beyond-a-reasonable-doubt standard and the requirement of jury unanimity do not apply to mitigating factors." (*People v. Rogers* (2006) 39 Cal.4th 826, 897.)

Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review. (*People v. Russell*, *supra*, 50 Cal.4th at p. 1274; *People v. Salcido* (2008) 44 Cal.4th 93, 166.)

The trial court was not required, at defendant's request, to delete the inapplicable factors in aggravation and mitigation. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1185; *People v. Maury* (2003) 30 Cal.4th 342, 439-440 [when a jury has been given standard statutory instructions, we assume it has followed such instructions and has concluded that mitigating factors were inapplicable if not supported by the evidence].) Nor was the trial court "constitutionally required to instruct the jury as to which of the listed sentencing factors are aggravating, which are mitigating, and which could be either mitigating or aggravating, depending

---

[29] To the extent defendant casts this claim as one of instructional error, his failure to request a clarifying instruction at trial forfeits review of the issue. (*People v. Russell*, *supra*, 50 Cal.4th at p. 1273.)

51

upon the jury's appraisal of the evidence. [Citations.]" (*People v. Jennings*, *supra*, 50 Cal.4th at p. 690.) "Additionally, 'the statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors amounted to aggravation. [Citation.]' " (*Ibid.*) Finally, the inclusion of inapplicable factors did not deprive defendant of his right to an individualized sentencing determination based on permissible factors relating to him and his crime. (*People v. Carter* (2005) 36 Cal.4th 1215, 1280.)[30]

---

[30] In connection with these claims, defendant contends the prosecution separately discussed section 190.3, factor (d) (extreme mental or emotional disturbance), factor (e) (victim participant), factor (f) (moral justification), factor (g) (extreme duress or substantial domination), factor (h) (impairment or intoxication), and factor (j) (defendant accomplice), and then argued to the jury that the absence of evidence in mitigation under these factors made each factor one in aggravation. We have held it error for a prosecutor to make this type of argument (*People v. Lucas* (1995) 12 Cal.4th 415, 491 (*Lucas*); *People v. Davenport* (1985) 41 Cal.3d 247, 289), but it is unclear whether defendant advances a misconduct claim on this basis.

To the extent a misconduct claim is presented, defendant forfeited its review by failing to make appropriate objections or requests for admonishment at trial. (See *Lucas*, *supra*, 12 Cal.4th at pp. 491-492.) In any event, "[w]e have repeatedly held that the prosecutorial comment to which defendant now objects is nonprejudicial" where, as here, the prosecution's closing argument emphasized the aggravated nature of the charged crime, relevant under section 190.3, factor (a), as the main basis for a death verdict and also relied on other evidence of the defendant's prior violent conduct, relevant under section 190.3, factor (b). (*Lucas*, at p. 492, and cases cited.)

Rather than asserting a misconduct claim per se, defendant appears to contend he was prejudiced by the combination of the prosecution's erroneous argument and the court's failure to delete inapplicable factors from the standard instruction and failure to instruct that certain factors could be considered solely as mitigating. We have rejected similar contentions in the past. As we explained in *Lucas*, *supra*, 12 Cal.4th at page 493, the standard penalty phase instructions "helped assure that the jury was not misled [citations], and permit us to assume the jury understood how to evaluate the absence of a particular mitigating factor

*(footnote continued on next page)*

"[A]djectives such as 'extreme' in section 190.3, factors (d) and (g), or 'substantial' in section 190.3, factor (g), do not serve as an improper barrier to the consideration of mitigating evidence. [Citation.]" (*People v. Jennings*, *supra*, 50 Cal.4th at p. 690.)

California's death penalty sentencing scheme is not constitutionally defective in omitting to provide for intercase proportionality review. (*People v. Russell*, *supra*, 50 Cal.4th at p. 1274; *People v. Jennings*, *supra*, 50 Cal.4th at p. 691.) Moreover, "[b]ecause capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. [Citation.]" (*Jennings*, at p. 690.)

Finally, we once again reject the contention that California's use of the death penalty is "inconsistent with international norms" and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Russell*, *supra*, 50 Cal.4th at p. 1275; *People v. Jennings*, *supra*, 50 Cal.4th at pp. 690-691.)

---

*(footnote continued from previous page)*

[citation]. Such properly instructed jurors were 'unlikely to give substantial aggravating weight to the absence of obviously mitigating factors, such as victim participation or consent, belief in moral justification, or extreme duress or domination, which are rarely present in capital homicides.' [Citation.]" This reasoning is equally applicable here, where the jury received the same instructions, even though the jury also heard improper argument concerning the absence of extreme mental disturbance and impairment as factors in aggravation.

### K.  Cumulative Error

Defendant contends the cumulative prejudicial effect of the errors in both the guilt phase and the penalty phase requires reversal of his conviction and sentence of death.  We have rejected nearly all of defendant's claims of error, and when we have found or assumed error, we have determined defendant was not prejudiced.  Whether such claims are considered individually or together, we find no prejudicial error at either phase of the proceedings.

### III.  DISPOSITION

We conclude that the trial court had no authority to strike the lying-in-wait special circumstance (§ 1385.1), and we hereby order its reinstatement (§ 1260).  As modified, the judgment is affirmed.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mendoza

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S065467
**Date Filed:** November 10, 2011

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Alfonso M. Bazan

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Denise Kendall, Assistant State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, Sharlene A. Honnaka, John R. Gorey, Karen Bissonnette and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Denise Kendall
Assistant State Public Defender
221 Main Street, 10th Floor
San Francisco, CA 94105
(415) 904-5600

Blythe J. Leszkay
Deptuy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 620-6426