Filed 5/5/14  P. v. Shields CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 81115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8111(b).  This opinion has not been certified for publication or ordered published for purposes of rule 81115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B246643 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA088324) |
| v. | |
| DANIEL SHIELDS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James B. Pierce, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E Winters, Senior Assistant Attorney General, Victoria B. Wilson and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Daniel Shields on one count of attempted willful, deliberate and premeditated murder, three counts of assault with a firearm, one count of possession of a firearm by a felon and one count of shooting at an inhabited dwelling and found specially alleged criminal street gang and firearm-use enhancements to be true.[1] The trial court sentenced Shields to an indeterminate aggregate state prison term of 105 years to life. On appeal, Shields contends the trial court committed prejudicial error by introducing evidence that prosecution witnesses were afraid to testify and permitting the prosecutor to argue to the jury that fear of gang retaliation affected the way in which they testified. Shields also asserts the trial court made several sentencing errors. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Summary of Prosecution Evidence

### A.  The Shootings

Jose Lopez Sandoval was struck by several gunshots on a street in Long Beach. Desiree Phillips, her sister Kristal Lewis, and her nine-year-old daughter Leonna Glover were also wounded by the gun shots while inside Phillips's apartment. The primary issue at trial was the identity of the shooter. The prosecution's theory was that Shields, an admitted gang member, shot Sandoval after seeing him in the company of rival gang members. The defense theory was that someone other than Shields fired the gun at Sandoval, possibly a juvenile. Pablo Villalobos, Lewis and Sandoval identified Shields as the shooter either to police and or in court.

On the evening of June 30, 2010, Sandoval was greeted inside a pedestrian tunnel by two Northside Longo gang members. They warned Sandoval that someone in the area had a gun. Sandoval looked to his left and saw Shields, a member of the Compton Varrio USV gang. Shields was holding a gun. Two men were with him, one of whom was in a wheelchair, the other man had a gun. Fearing there would be gunfire, Sandoval picked

---

[1]     The jury acquitted Shields of unrelated charges of murder and possession of a firearm by a felon.

up a two-year old girl standing nearby and carried her to an apartment. When Sandoval left the apartment a short time later, Shields pointed the gun at him. Sandoval turned to run, heard multiple shots and was hit in the elbow and the leg. Sandoval was transported to the hospital, where he underwent surgery for his gunshot wounds.

Police tracked Shields and his girlfriend Keelin Marie Hicks to a hotel in Long Beach. Following Shields's arrest, officers searched the hotel room and found a semiautomatic handgun. A criminalist determined the shell casings at the scene of the shootings had been fired from the recovered handgun that Hicks identified as belonging to Shields. During an interview with Long Beach Police Officer Robert Owens, Hicks said when officers came to the hotel, Shields attempted to jump out the back window. Shields then produced the gun he always carried in his pocket and threatened to kill himself. Hicks convinced Shields not to shoot himself; she also feared he might shoot her. Shields hid the gun under a hotel room chair before he was taken into custody. Owens testified Hicks told him she was very scared and did not want Shields to know she was talking to police. Hicks said Shields would kill her if he found out about the police interview; he had previously beaten and choked her on several occasions. Shields also knew where she and her parents lived.

### B. The Subsequent Identifications of Shields as the Shooter

Pablo Villalobos was sitting in his truck on the evening of June 30, 2010, when he noticed some young men walking down the street. In his rearview mirror, Villalobos saw Shields firing a gun. Villalobos later selected Shields's photograph from a group of photographs shown to him by police officers and identified Shields as the shooter. He also identified Shields at trial as the shooter. Villalobos was afraid to testify; he had relocated his family to another city before trial, expressing concern for his family's and his own safety.

From inside her sister's apartment that evening, Lewis noticed several men outside, one of whom was in a wheelchair. A Hispanic man was walking by the apartment. Lewis and her sister Phillips stepped outside to call in their children, when

Lewis saw one of the men pull out a gun and point it at the Hispanic man... Numerous gunshots struck the apartment and wounded Lewis, Phillips and Glover. The Hispanic man was now lying on the ground nearby; he had been shot The men fled.

When interviewed by police, Lewis did not identify the shooter from a group of photographs that included Shields's photograph. Although Lewis recognized Shields as the shooter at the preliminary hearing, she did not identify him because she feared retaliation for having cooperated with police. Lewis and her family still lived in the neighborhood. Lewis later confided to Phillips that Shields was the shooter. Lewis also identified Shields as the shooter in court.

While at the hospital, Sandoval was shown a group of photographs by police, from which he selected Shields's photograph, identifying him as the person who had raised a gun immediately before shots were fired. Later, Sandoval told officers that Shields was not the person who had fired the gun. He described the shooter to officers as a young man with a dark complexion.

### C. Gang Expert Testimony

Los Angeles County Sheriff's Department Detective Joseph Summer, a gang expert, testified that Shields was a documented member of the Compton Varrio USV gang, whose primary activities included assault with a deadly weapon, attempted murder, murder and drug-related offenses. The gang is relatively small, has no allied gangs, but considered itself under the umbrella of the Mexican Mafia. The area in which the shooting occurred was Compton Varrio USV territory, bordering the territory of Northside Longo, a rival gang. Summer opined that shooting someone who is seen associating with Northside Longo gang members in that area would not only bolster the reputation of a Compton USV gang member, but also benefit the gang itself by instilling fear in the community.

Summer explained a gang member or any individual who cooperates with law enforcement or testifies against any gang member would be labeled as a snitch. "Whether a gang member or non-gang member, it doesn't matter. Gang members do not

4

care.  If somebody snitches on them, they're going to get him. . . .If you're a snitch, you're subject to assault, even death."  Summer then described instances in which gang members had killed snitches, who were both in and out of custody.  Individuals living in gang-controlled communities who witness a gang-related crime are so fearful of gang retaliation they typically will not come forward or will change or recant in court their earlier statements to police or will refuse to testify at all.  According to Summer, inmates who are considered snitches can be targeted for harm by Southsiders, members of the Mexican Mafia who control the daily activities of inmates belonging to Hispanic gangs.

## II.  Summary of Defense Evidence

### A.  Shields's Testimony

Shields testified in his defense and admitted he was a member of the Compton Varrio USV gang.  He admitted prior convictions for commercial burglary and making a criminal threat.  On the evening of the shooting, Shields and Richard Enriquez, who was in a wheelchair, were leaving a liquor store when they saw two Northside Longo gang members across the street.  Shields was not carrying a weapon.  The two gang members challenged Shields, and he chased them away.  Shields started to head back to his apartment, when he encountered two fellow gang members.  The three of them were soon joined by Enriquez.  Sandoval approached them and called to Shields, who was acquainted with Sandoval .  One of the members of Shields's gang pulled out a gun and started shooting.  Shields told the shooter to stop and then fled.  Shields did not want to identify the shooter, because he did not want to be labeled a snitch.  Shields later picked up the gun used in the shooting and kept it in his hotel room.  Shields admitted he had choked Hicks in the past and conceded she might be afraid of him.

### B.  Richard Enriquez's Testimony

Enriquez testified that after Shields was challenged by the Northside Longo gang members, he telephoned Lazy and Pasayo, who were about 15 years old.  They showed up minutes later with a gun and gave it to Shields.  Shields, Lazy and Pasayo chased after the Northside Longo Gang members and caught up with them.  There was an argument

5

and gun shots.  Enriquez saw Shields firing a gun at the rival gang members, who ran away.

## DISCUSSION

### I.  Shields's Sentence for Assaults with a Firearm, Counts 8 and 9, Is a Legal Sentence

Shields was sentenced to an indeterminate aggregate state prison term of 105 years to life, calculated as follows:  On count 2 (attempted willful, deliberate and premeditated murder of Sandoval), the court sentenced Shields to 40 years to life—15 years to life for attempted murder, plus 25 years to life for the firearm-use enhancement (Pen. Code, § 12022.53, subd. (d)).  On count 11 (shooting at an inhabited dwelling) the court sentenced Shields to 40 years to life—15 year years to life, the alternative penalty for the gang allegations (Pen. Code, § 186.22, subd. (b)(4)(B)), plus 25 years to life for the firearm use enhancement.  On count 8 (aggravated assault on Phillips), which the court identified as the principal determinate term, the court sentenced Shields to 19 years—the upper term of four years for the aggravated assault, plus the upper term of 10 years for the firearm-use enhancement (Pen. Code, § 12022.5), plus five years for the criminal street gang enhancement (Pen. Code, § 186.22, subd. (b)(1)(B))  On count 9 (aggravated assault on Glover), Shields was sentenced to a consecutive term of six years—one year for the aggravated assault (one-third of the middle term of three years), plus three years four months (one third of the upper term of 10 years) for the firearm-use enhancement, plus one year eight months (one third of the five-year term) for the criminal street gang enhancement.  Sentencing on the remaining counts was stayed pursuant to Penal Code, section 654.

Shields contends, and the People concede, the sentences for the aggravated assault on counts 8 (Phillips) and 9 (Glover) were unauthorized.  Both assert that the trial court erroneously imposed firearm-use enhancements and Penal Code, section 186.22, subdivision (b)(1)(C), gang enhancements as to each count, in violation of *People v. Rodriguez* (2009) 47 Cal.4th 501, 508.  However, a review of the record demonstrates that the court instead, as urged by the prosecution in its sentencing memorandum,

6

sentenced Shields to the 5 year gang enhancement under Penal Code, section 186.22, subdivision (b)(1)(B), a result not prohibited by *Rodriguez*. The court did not err.

## II. The Testimony of Sandoval and Hicks and the Prosecutor's Argument Concerning their Fear of Retaliation

Although Shields never interposed the objection at trial, he contends on appeal the trial court committed prejudicial abuse of discretion by allowing into evidence the trial testimony of Sandoval and Hicks bearing on their fear of retaliation. Shields is not claiming prosecutorial misconduct but argues the trial court's evidentiary error was exacerbated by the prosecutor's closing argument to the jury.

### A. Sandoval's Testimony

At the time of trial, Sandoval was serving a one-year sentence in county jail for possession of a knife and methamphetamine. On direct examination, Sandoval acknowledged he had identified Shields as the shooter at the preliminary hearing but stated he was not certain it was Shields who had fired the gun. Sandoval explained when he saw Shields point the gun, he turned to flee and then heard multiple shots, some of which struck him.

The prosecutor asked if Sandoval recalled their conversation that morning before trial. Sandoval testified he remembered telling the prosecutor and the investigating officer he was really afraid because of everything that had happened to him; he had nearly died. Without objection, the prosecutor asked why Sandoval had two black eyes. Sandoval answered he had been attacked in jail by five to eight gang members on a day he was supposed to appear in court. They pounded his head, giving him the two black eyes, stabbed him 11 times and told him not to testify and to "play dumb" in court. Sandoval was now worried about further retaliation if he testified because "Southside takes care of business."

### B. Hicks's Testimony

On direct examination, Hicks stated she was uncomfortable testifying and denied or claimed to remember vaguely having made certain statements to police, which

implicated Shields in the shootings Hicks acknowledged she had "possibly" told Officer Owens that she did not want Shields to know she was talking to police, that he had choked and beaten her on several occasions and that he knew where Hicks and her parents lived.

### C. Prosecutor's Closing Argument

In his closing argument, the prosecutor responded to defense counsel's argument the People were using gang evidence to prejudice the jury against Shields.[2] The prosecutor explained the purpose of that evidence was to show, as permitted by law, how the fear of gang retaliation affected the manner in which witnesses relate to police and testify in court. The prosecutor urged the jury, "Don't use the evidence to think 'oh, the defendant is a bad guy. I want to convict him.' Use that evidence to understand why the witnesses feel the way they do." The prosecutor repeated his argument that Sandoval

---

[2]    In the initial phase of closing argument, the prosecutor reminded the jury that Villalobos, Sandoval and Lewis had been reluctant to testify and to identify Shields for fear of gang retaliation. Sandoval, in particular, had good reason to be in fear. "Because he's a living example of what can happen if you testify against a gang. I mean in his mind he believes he was attacked in county jail because he was a witness on this case. And you saw the black eyes. He had a fractured orbital. He'd been shanked. He's living testimony, just his body, of what can happen. And the fact that it's reality, the fact that these other witnesses, when they talk about the concerns that they have, that's real. There's a basis for these concerns, ladies and gentlemen." The prosecutor went on to argue that once the threat of gang retaliation is understood as a viable reason for the witnesses' inconsistent or incomplete statements to police or in court, it is possible to "see the truth clearly." In his argument, defense counsel told the jury, "[W]hen [the prosecutor] leads off by telling you that this is about gang violence, and more to the point, the threat of gang violence, what he means to say is never mind the evidence in this case. Look at this guy and fear him, and base your verdict on that fear. That's what that's for." "When the district attorney starts off by asking you to consider the threat of violence, he's asking you to consider m client a threat. Okay, and you've got to know that's not what you can base your decision on when you get in that room. You're not all going to sit around that table back there and discuss whether or not my client is a threat, poses a threat of violence. All 12 of you are going to sit back and consider the evidence in this case. That's what you're going to consider."

believed himself to have been the victim of gang retaliation in jail, and Villalobos was so afraid of gang retaliation he moved his family from the area and their fears impacted the manner in which they testified.  The prosecutor concluded, "I mean, this is why we have trials.  You can watch people and assess their credibility.  Is he telling the truth when he says he's scared?"  The prosecutor later argued Hicks was scared of Shields because he had choked and beaten her, which affected her testimony.

### D. Admission of Testimony Regarding Sandoval's and Hicks's Fear of Retaliation Was Not a Prejudicial Abuse of Discretion

Shields argues Sandoval's testimony of his attack in jail by gang members and Hicks's testimony of prior assaults by Shields should have been excluded under Evidence Code section 352 as more prejudicial than probative.  Shields also argues the evidence suggested he had a predisposition to commit crimes and was therefore also inadmissible under Evidence Code, section 1101, subdivision (a), which prohibits use of evidence of a person's character (a propensity to engage in a particular type of behavior) as a basis for an inference that he or she acted in conformity with that character on a particular occasion (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393).

"Evidence Code section 353, subdivision (a), provides that a judgment shall not be reversed because of the erroneous admission of evidence unless there was a timely objection 'so stated as to make clear the specific ground of the objection . . . .'  'The reason for the requirement is manifest:  a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 979; accord *People v. Valdez* (2012) 55 Cal.4th 82, 130.)

Notwithstanding his failure to object at trial, Shields's claims fail on the merits.  Evidence a witness fears retaliation for testifying is relevant to the witness's credibility.  Accordingly, the trial court has discretion to admit such evidence, including testimony regarding the basis for the witness's fear.  (*People v. Mendoza* (2011) 52 Cal.4th 1056,

9

1084.)  There is no requirement to show that the threats against the witness were made by the defendant personally or that the witness's fear of retaliation is directly linked to the defendant.  (*People v. Sapp* (2003) 31 Cal.4th 240, 281.)  "It is not necessarily the source of the threat -- but its existence -- that is relevant to the witness's credibility."  (*People v. Burgener* (2003) 29 Cal.4th 833, 870.)

The trial court acted within its discretion in admitting the evidence of the attack on Sandoval by gang members and the prior assaults by Shields on Hicks.  Witness credibility was a critical issue in this case.  The general reluctance of all the prosecution's lay witnesses, including Sandoval and Hicks, to testify against Shields, the extent to which their testimony may have been influenced by fear of retaliation and the reasons for their fear were relevant to the probative value of their testimony.  Sandoval identified Shields as the shooter to police and at the preliminary hearing.  However, Shields equivocated in identifying Shields at trial after being beaten and stabbed in jail, because he feared he would be vulnerable to further attacks by gang members if he testified truthfully.  Hicks told police about events following the shooting that incriminated Shields and expressed fear Shields would kill her in retaliation for cooperating with police because he had beaten and choked her in the past.  At trial, Hicks indicated she was uncomfortable testifying and repeatedly expressed her inability to recall, or lack of certainty about, the events she had described to police implicating Shields in the shootings.  The trial court properly admitted evidence of the attack on Sandoval and the prior assaults on Hicks to explain the basis for their obvious fear of testifying.  (See *People v. Mendoza*, *supra,* 52 Cal.4th at p. 1084.)  Accordingly, the evidence had substantial probative value justifying its admission.  (See *People v. Karis* (1988) 46 Cal.3d 612, 638.)

Shields argues Sandoval's testimony was unduly prejudicial because there was no showing Shields was responsible for the jailhouse attack.  Showing the attackers could be directly linked to Shields was not necessary; the evidence was relevant to establish Sandoval's fear of testifying against Shields at trial.  (*People v. Mendoza, supra*, 52 Cal.4th at p. 1084 ["evidence of a 'third party' threat may bear on the credibility of the

witness, whether or not the threat is directly linked to the defendant"].) The probative value of the attack did not depend on Shields having actually directed or ordered it, but on Sandoval's belief he would be subjected to similar harm in the future if he were to testify against Shields, and the impact this belief may have had on Sandoval's trial testimony.

To the extent, as Shields maintains, the attack on Sandoval suggested Shields had committed or would commit other crimes against Sandoval, and is thus inadmissible under Evidence Code section 1101, subdivision (a), Sandoval's testimony focused not on his fear that Shields himself would retaliate against him for his testimony but Sandoval's concern that, because he had cooperated with the police and the prosecutor, he would be vulnerable while incarcerated to further attacks by Southsiders if he were to testify at trial. In addition, Sandoval confirmed on direct examination and cross-examination that he had never had any conflicts with Shields, who was not among his attackers in jail.

Unlike Sandoval, Hicks's fear of retaliation was directly attributable to Shields's prior misconduct towards her. However, Hicks' testimony regarding her apprehension about testifying and her earlier statements to police as to the reasons for her concern was properly received under Evidence Code section 780, subdivision (j), which identifies the witness's "attitude toward the action in which he testifies or toward the giving of testimony" as one of the common factors that bear on the question of credibility. Here, too, because the evidence was admitted for a purpose other than to show Shields's propensity to engage in assaultive behavior, it was admissible. (Evid. Code, § 1101, subd. (b).)

Finally, in his closing argument, the prosecutor did not urge the jury to consider the challenged evidence for an improper purpose. To the contrary, the prosecutor told the jury directly that evidence should be considered in assessing witness credibility, not to convict Shields because of any bias or prejudice against him.

11

**DISPOSITION**

The judgment is affirmed.


ZELON, J.


We concur:


WOODS, Acting P. J.


SEGAL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.