Filed 12/2/21  P. v. Chiles CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092533 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F02436) |
| v. | |
| ISSHIAH CHILES, | |
| Defendant and Appellant. | |

After a court trial, the trial court found defendant Isshiah Chiles guilty of robbing one man and murdering another over the course of several days.  The trial court found true allegations that defendant personally used a firearm and personally used a firearm causing great bodily injury or death in the commission of both offenses, and further found that defendant committed the murder during the commission of a robbery.  The trial court sentenced defendant to an indeterminate prison term of 75 years to life, plus a determinate term of four years.  The trial court also ordered defendant to pay various fines and fees.

1

Defendant appeals, arguing he received ineffective assistance of counsel on two occasions during the trial. First, defendant argues defense counsel rendered ineffective assistance by failing to object when the prosecutor purported to define the word "fixie" in closing argument.[1] Second, defendant argues defense counsel rendered ineffective assistance by failing to object to the admission of evidence concerning acts of witness intimidation by his mother and other close associates. We reject both contentions.

Defendant also challenges the imposition of certain fees and fines. He raises two contentions on this subject. First, he argues the abstract of judgment includes restitution and parole revocation fines that were waived by the trial court in the oral pronouncement of judgment and must be amended to correct the error. The People concede the discrepancy and recommend that we remand for resentencing, which we shall do. Second, defendant argues his trial counsel was ineffective in failing to object to the imposition of court facilities and court security fees under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). Because we are remanding for resentencing, we deem it unnecessary to reach this last contention.

## I. BACKGROUND

### A. Robbery of Cody

Cody was riding home from an event on a friend's bicycle around midnight on December 13, 2014. He stopped in front of the Antelope Vista apartment complex in Antelope to smoke a cigarette. As he smoked, he noticed three young African American men approaching. Two of the men looked similar, as though they may have been brothers. The third man wore a mask of the type worn by motorcyclists. The mask had a skull pattern and covered most of the man's face.

---

[1] As we shall discuss, a "fixie" is a fixed gear bicycle.

The masked man stood in front of Cody and demanded to know his name. Cody responded. The masked man then reached for the waistband of his pants, and Cody, sensing trouble, handed over his backpack, phone, and wallet.[2] The men emptied the contents of the backpack and wallet onto the ground and walked away, taking the bicycle with them. Cody gathered his belongings from the ground. He looked up and saw the three men standing nearby. The masked man was pointing a gun at him. Cody ducked. He heard a gunshot and saw that he had been shot in the leg. His uncle, who lived in the apartment complex, heard Cody yelling and called 911.

Sacramento County Sheriff's deputies responded to the apartment complex and found Cody lying on the sidewalk. Cody was taken to the hospital, where doctors removed fragments of a .22 bullet from his leg. Cody was unable to identify defendant as the shooter or describe the gun.

Sheriff's deputies executed a search warrant for defendant's apartment on December 20, 2014. They found four cell phones, two of which belonged to defendant.[3] One of the phones contained a series of messages on Kik, a messaging application. On December 13, 2014, a person with the screenname "Zay_teamshit," who was later determined to be defendant, wrote, "I got a gun." The next day, in response to a question from another user, "Zay_teamshit" said the gun was a " 'Revolver,' " adding, " 'It's a 32.' " Later that day, "Zay_teamshit" asked, " 'Y'all here [*sic*] about a nigga getting shot in Antelope?' " "Zay_teamshit" continued, " 'I shot somebody last night because he tried to bounce[] out. Popped him in the stomach.' " Another user, later identified as M.D., wrote, " 'He Popped brah in front of Antelope Vista.' " Following a discussion of where

---

[2] Cody would later tell a Sheriff's deputy that the masked man instructed him to " 'break your pockets,' " which Cody understood to mean "empty your pockets." However, Cody could not remember what the masked man said to him at trial.

[3] No weapons were found in the search.

blood from the shooting might be found, "Zay_teamshit" wrote, " 'But I got me a fixie.' "
Sheriff's detectives determined that only one shooting had recently taken place near the
Antelope Vista Apartments: the shooting of Cody.

*B.       Murder of D.R.*

A homeless man gave 13-year old C.S. $10 to buy marijuana, which he agreed to
share with the boy.  C.S. called one of two brothers—D.C. or L.C.—to buy the
marijuana.[4]  D.C. was 15 or 16 years old, and L.C. was 18.  C.S. arranged to meet L.C.
by the stairs leading to the brothers' apartment.  C.S. was told to come alone, but he
brought a friend anyway, 20-year old D.R.

L.C. and D.C. lived in an upstairs apartment with their parents.  Defendant, then
16, lived in a downstairs apartment in another building in the same complex.  L.C. was
playing video games in defendant's apartment with defendant and two other young men,
E.D. and M.D., on December 16, 2014.  L.C. understood E.D. and M.D. to be related in
some fashion.[5]

After some time, L.C. received a telephone call from C.S., who wanted to buy
marijuana from D.C.  L.C. instructed C.S. to come to the apartment complex and call
again when he arrived.  L.C. then ended the call.  Defendant, who was within earshot,
asked whether L.C. was planning a "lick."  L.C. understood defendant to be asking
whether they would be robbing C.S.  L.C. responded that C.S. was a friend, and he was
planning to sell him $10 worth of marijuana, not rob him.  C.S. called L.C. again a short
time later, and L.C. left defendant's apartment, accompanied by E.D. and M.D.
Defendant stayed behind.

---

[4]  D.C. and L.C. shared their mother's phone.

[5] M.D. would later testify that E.D. is his nephew, and around the same age as he.

4

The trio made their way to L.C.'s building. They ran into C.S., who was sitting on the stairs leading to L.C.'s apartment. C.S. was alone, having instructed D.R. to wait for him by the front gate of the apartment complex. L.C. greeted C.S. and went upstairs to get the marijuana.

L.C. returned with the marijuana a short time later.[6] He started to hand the marijuana to C.S. As he did so, a man emerged from a bush near the stairs. The man was holding a revolver with a black or brown handle and wearing a hoodie jacket with a skull face mask. L.C. recognized the masked man as defendant by his clothes, shoes, and distinctive right eye, which was visible through the mask. L.C. also recognized the gun, which defendant had shown him on previous occasions.

Defendant pointed the gun at L.C. and took the marijuana and phone from L.C.'s hand. Defendant then turned the gun on C.S. and demanded that he hand over his money. L.C. recognized defendant's voice and ran away, leaving C.S. alone with the robber.

Defendant asked C.S. where his friend was. C.S., afraid for his life, led defendant towards the entrance to the apartment complex, where D.R. was waiting. Defendant pointed the gun at D.R. and demanded that he hand over "everything." D.R. laughed "like it was a joke," and C.S. warned "that it was serious, that it was a real gun." Defendant then put the gun in D.R.'s mouth. D.R. grabbed for it. A shot rang out. Defendant then ripped the gun from D.R.'s hand and shot him. C.S. took off running.

L.C., meanwhile, had run around one of the buildings in the apartment complex, and then back towards his own apartment. As L.C. ran, he heard two shots. When L.C. returned to the area near his apartment, he ran into members of his family, including

---

[6] There is some conflict in the evidence as to whether E.D. and M.D. were present when L.C. returned. C.S. testified they were still there (although he described two men with similar, though not identical names); L.C. testified they were not. These inconsistencies are not material to any issue on appeal.

5

D.C., who told him there was a body lying inside the apartment complex. L.C. and D.C. checked and recognized the body as D.R.[7] An autopsy would later establish that D.R. died from a .32 caliber gunshot wound to the chest.

A crowd gathered around D.R.'s lifeless body. L.C.'s father called 911. L.C. stood nearby. Defendant appeared, accompanied by his mother. He pulled L.C. aside and warned, "if you say anything I'm going to shoot you too." Defendant also ordered L.C. to tell police that C.S. was the shooter. Law enforcement arrived a short time later. L.C. told them C.S. was the shooter. Later, L.C. learned that C.S. had been arrested for murder. L.C. suffered a crisis of conscience and told his parole officer the truth: that defendant was the shooter, not C.S.

On December 17, 2014, "Zay_teamshit" exchanged messages with an unknown interlocutor complaining that police were " 'trying to pin me for murder.' " On December 18, 2014, "Zay_teamshit" exchanged messages with defendant's girlfriend regarding the possibility of being " 'locked up.' " Speaking, apparently, of a possible prison term, defendant's girlfriend wrote, " 'Blood it's 8 to 10 years or SUMN.' " "Zay_teamshit" replied, " 'Nigga 25 to life.' " A phone found in defendant's pocket contained a video of a person holding a .32-caliber six-shot revolver with a brown wooden handle. The gun's cylinder contained four .32-caliber hollow-point bullets. The person holding the gun in the video had a tattoo on his arm matching one on defendant's arm.[8] The video was dated December 11, 2014, three days before the robbery of Cody on December 14, 2014, and five days before the murder of D.R. on December 16, 2014.

---

[7] L.C. knew D.R. as "Griffen."

[8] The record before us indicates that the person in the video has a tattoo on his left arm and defendant has tattoos on both arms. The record does not clearly indicate that the tattoos match. However, the parties each assert the tattoos were a match, and we accept their agreed facts as mutual concessions. (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 3.)

*C.* *Charges and Court Trial*

Defendant was arrested and charged in a felony complaint deemed an information with murder (Pen. Code, § 187, subd. (a)—count one),[9] robbery (§ 211—count two), and assault with a firearm (§ 245, subd. (a)(2)—count three).[10] The information further alleged as to both the murder and robbery that defendant personally used a firearm causing great bodily injury or death (§ 12022.53, subds. (b)-(d)) and that he personally used a firearm in the commission of the assault (§ 12022.5, subd. (a)(1)). The information further alleged that defendant committed the murder during the commission of a robbery. (§ 190.2, subd. (a)(17).) Defendant pled not guilty and denied the allegations.

Defendant was deemed fit to be tried as an adult. (Welf. & Inst. Code, § 707, subd. (b)(1).) He waived his right to a jury trial and elected to proceed by court trial. He then pled no contest to count three (assault with a firearm) and admitted the allegation that he personally used a firearm during the commission of that offense. In exchange for the plea, the parties agreed that defendant would receive the low term of two years for the assault, plus four years for the firearm enhancement, for a total of six years. Sentencing was delayed pending completion of defendant's trial on the remaining charges and enhancements.

A court trial was held over the course of several days in October and November 2019. The prosecution's witnesses testified substantially as described *ante*. The prosecution also presented testimony from L.C. and another witness that people other than defendant had threatened them. We describe this evidence *post*. The defense did not call any witnesses.

---

[9] Undesignated statutory references are to the Penal Code.

[10] The assault with a firearm charge alleged in count three arose from an unrelated incident.

*D.* *Verdict and Sentence*

The trial court found defendant guilty of both the robbery of Cody and the murder of D.R. The trial court found true the allegations that defendant personally used a firearm and personally used a firearm causing great bodily injury or death in the commission of both offenses (§§ 12022.53, subd. (d), 12022.5, subd. (a)(1)), and further found that defendant committed the murder during the commission of a robbery (§ 190.2, subd. (a)(17)). The trial court sentenced defendant to an indeterminate prison term of 75 years to life, plus a determinate term of four years. The trial court also imposed various fines and fees described *post*. This appeal timely followed.

## II. DISCUSSION

*A.* *Ineffective Assistance of Counsel*

Defendant argues he received ineffective assistance of counsel on two occasions. First, he argues his trial counsel rendered ineffective assistance by failing to object when the prosecutor purported to define the word "fixie" in closing argument. Second, he argues his trial counsel rendered ineffective assistance by failing to object to evidence of third-party threats to L.C. and another witness. We reject both contentions.

*1.* *Applicable Law*

"The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206-207.)

8

Ineffective assistance claims may be raised and decided on direct appeal, and they can be found meritorious when the record reveals that counsel did not or could not have a reasonable strategic decision for the challenged action or inaction. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Gray, supra,* 37 Cal.4th at p. 207.) "Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*Ibid.*) " 'Failure to object rarely constitutes constitutionally ineffective legal representation.' " (*Ibid.*)

2.      *Failure to Object During Closing Argument*

As noted, sheriff's deputies searched defendant's apartment and found a phone containing a series of Kik messages concerning a shooting near the Antelope Vista Apartments. One of the messages, which was later attributed to defendant, said, " 'I shot somebody last night because he tried to bounce[] out.' " Another message, also attributed to defendant, said, " 'But I got me a fixie.' " During the trial, the prosecutor elicited testimony from Sergeant Zachary Rose, formerly detective, a homicide investigator with the Sacramento County Sheriff's Department, about the meaning of the Kik messages. When the prosecutor asked whether Rose had any idea what the word "fixie" meant, the detective responded, "I do not." The trial court then asked, "You don't know what a fixie is?" Rose reiterated, "I do not, your Honor."

The prosecutor returned to the Kik messages in closing argument. During a discussion of the robbery and shooting of Cody, the prosecutor observed, "at one point, the defendant in the just minute or two where these texts are flying around—he indicates that he got himself a fixie. And we all know the only thing that was actually taken from

Cody [] was a bicycle. [¶] I've always heard of a fixie being a bicycle. That's what I've heard. I don't know if I'm out of line by saying that, but I think a fixie is a bike, from my historical understanding of that term." The prosecutor concluded, "So take that for what it is. That's the only thing that was actually stolen or taken during the robbery and shooting of Cody." Defendant's trial counsel made no objection, and the prosecutor continued his argument, moving on to a discussion of the murder of D.R.

The trial court referred to the Kik messages in announcing its verdict. With respect to the "fixie" message, the trial court said, "And you don't have to be a genius to know what a fixie is. A fixie has actually come back into sort of favor as a—it's almost a yuppy term for a fixed bicycle." The trial court then moved onto the other evidence supporting the verdict on the robbery charge, noting that "there's way more in here that is important."

Defendant argues the prosecutor committed prejudicial misconduct by purporting to define the word "fixie" in closing argument. He argues the prosecutor's "historical understanding" of the word amounted to facts not in evidence and urges us to find ineffective assistance based on his trial counsel's failure to object. We decline to do so. Contrary to defendant's implicit premise, the word "fixie" is not especially unusual or esoteric, and defense counsel could have reasonably believed that the prosecutor's comments referred to matters within common knowledge or experience, such that they could not be said to constitute misconduct. (*People v. Brown* (2004) 33 Cal.4th 382, 399-400 [prosecutors are given wide latitude during argument, and " 'may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience' "].) Although Sergeant Rose may have been unfamiliar with the word, defense counsel could have reasonably supposed the trial court was not, based on the court's reaction to Rose's profession of ignorance, which could have registered as surprise or incredulity. Such a supposition would have been confirmed by the trial court's subsequent characterization of "fixie" as "almost a yuppy term," indicating the

10

court viewed the word as having been accepted into common parlance (a view apparently shared by the online Oxford English Dictionary). (See Oxford English Dictionary Online < https://www.oed.com/view/Entry/37531707?redirectedFrom=fixie#eid > (as of Nov. 30, 2021) [defining "fixie" as "A bicycle that has a fixed wheel; *esp.* a single-gear bike whose wheels cannot move unless power is applied to the pedals"].) On the record before us, defense counsel could have reasonably believed that the prosecutor was not engaged in misconduct, and no objection was necessary or appropriate. (*People v. Brown, supra,* 33 Cal.4th at pp. 399-400.) But even assuming the argument was improper, defense counsel could have made a reasonable tactical decision to avoid calling attention to the "fixie" message by foregoing objections to the prosecutor's interpretation of it. (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549 ["The decision whether to object to an argument is an inherently tactical one that is not ordinarily reviewable on appeal"].) Defense counsel was not ineffective for failing to object.

*3.      Failure to Object to Evidence of Third-Party Threats*

Next, defendant argues his trial counsel rendered ineffective assistance by failing to object to evidence that L.C. and another witness were threatened by his mother and others. We are not persuaded.

As noted, L.C. testified that defendant pulled him aside after the shooting and warned that, if he said anything, he too would be shot. L.C. also testified that defendant's mother approached him the next day and returned his phone, saying that if L.C. had anything bad to say about her son, he should keep it to himself. L.C. understood defendant's mother to be threatening him to remain silent. L.C. further testified that defendant's mother's boyfriend glowered at him in the hallway of the courthouse when he appeared for defendant's preliminary hearing.

L.C. further testified that he and his family moved from the apartment complex to a new house shortly after the shooting. M.D. and E.D. drove by the new house and saw L.C. standing outside. They exchanged heated words regarding the possibility of L.C.

testifying and squared off to fight, but L.C.'s mother intervened before any punches were thrown. Afterwards, M.D. started driving by L.C.'s new house every day, two or three times a day. As he passed, M.D. would gesture with his hand as though simulating a gun. L.C. understood M.D. to be making a threat. Someone fired shots into L.C.'s house early one morning just a short time later. Around the same time, E.D. posted threatening messages on Facebook, decrying L.C. as a snitch.

Another witness, T.S., testified that she heard gunshots from her upstairs apartment on the night of the shooting and looked outside in time to see several people running from a body on the ground. T.S. also saw a small silver gun on the ground, and a woman, who picked the gun up. T.S. identified the woman as defendant's mother. About one week later, the woman came into the sandwich shop where T.S. worked and spoke about the shooting on her cell phone, all while staring at T.S. The woman then left without ordering anything. T.S. understood the woman to be threatening her.

Defendant acknowledges that evidence of his threatening behavior towards L.C. was properly admitted. However, he argues that evidence of threats by third parties—his mother, his mother's boyfriend, and E.D. and M.D.—was inadmissible, and his trial counsel was ineffective for failing to object to it. We disagree.

Evidence of a third party's attempt to intimidate a witness is inadmissible to show a defendant's consciousness of guilt, unless there is reason to believe the defendant was involved in the intimidation. (*People v. Abel* (2012) 53 Cal.4th 891, 924.) Here, as defendant accurately observes, there was no evidence he was involved in acts of witness intimidation by any third party. But that observation does not end our inquiry.

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of the witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) "Moreover, evidence of a 'third party' threat may bear on the credibility of the

12

witness, whether or not the threat is directly linked to the defendant." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

Defendant acknowledges that evidence of third-party threats against a witness may be relevant to the witness's credibility, but argues that principle does not apply here because L.C. was not reluctant to testify and did not equivocate under questioning. But defendant also acknowledges that L.C. was "surely afraid," and the record leaves little doubt that L.C.'s credibility was one of the most hotly contested issues at trial. Defendant's trial counsel extensively cross-examined L.C. on the fact that he changed his story to implicate defendant and repeatedly characterized L.C. as a liar in closing argument. Under the circumstances, defense counsel could have reasonably anticipated that the trial court would view the threats evidence as relevant to L.C.'s credibility, which had been front and center throughout the trial. Defense counsel could have also reasonably anticipated that objections to the threats evidence would be unlikely to succeed and could only serve to alienate the trial court and call further attention to damaging evidence. Defense counsel was not ineffective for failing to object. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].)

B.      *Fines and Fees*

Finally, defendant raises two challenges to the trial court's imposition of fines and fees. First, he argues the abstract of judgment erroneously reflects restitution and parole revocation fines that were waived in the trial court's pronouncement of judgment. Second, he argues defense counsel was ineffective in failing to object to the imposition of court facilities and court security fees under *Dueñas*. We accept the first contention and decline to reach the second.

Defendant appeared for sentencing in August 2020. In anticipation of sentencing, the probation department prepared a report recommending, inter alia, that the trial court order defendant to pay a restitution fine in the amount of $10,000 (§ 1202.4) and a parole

13

revocation fine in the same amount (§ 1202.45). The trial court appears to have reduced these amounts by handwritten interlineation to $300. When the time came for the imposition of fees and fines, the trial court ordered defendant to pay a "mandatory" court operations assessment of $120 (§ 1465.8) and a court facilities assessment of $90 (Gov. Code, § 70373). Referring to line items in the probation report, the trial court then stated, "Page 8, item 2, waived. Page 8, item 3, waived. Page 8, item 6 and 7 waived." These items included the recommended restitution and parole revocation fines under sections 1202.4 and 1202.45. The trial court then appears to have changed course, issuing an abstract of judgment reflecting restitution and parole revocation fines in the amount of $300 each.

Defendant argues the abstract of judgment fails to reflect the trial court's oral pronouncement of judgment because it includes restitution and parole revocation fines that were expressly waived. The People concede the discrepancy and urge us to remand for resentencing. We agree that remand is required.

Ordinarily, where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Here, however, the discrepancy involves mandatory restitution and parole revocation fees. (§§ 1202.4, subd. (b), 1202.45.) The trial court has a mandatory duty to impose a restitution fine "unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§1202.4, subd. (b); see also § 1202.45 [in every case in which the court imposes a restitution fine, imposition of a parole revocation fine is also mandatory].) The trial court made no such findings here. This was error.

Remand is required to allow the trial court to fully address the restitution and parole revocation fines and ensure the abstract of judgment is consistent with the court's oral pronouncement of those fines. Because we are remanding for resentencing, we

14

decline to reach defendant's claim that his trial counsel was ineffective for failing to object to the imposition of court facilities and court security fees under *Dueñas*. Defendant may raise his *Dueñas* arguments at the resentencing hearing, should he choose to do so. However, we note that our Supreme Court is currently considering the viability of *Dueñas* as it pertains to a criminal defendant's ability to pay assessed fines and fees and express no opinion as to the merits of any such argument defendant may choose to make on remand. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)[11]

---

[11] We also note that a defendant's inability to pay is not a compelling and extraordinary reason not to impose a restitution fine. (§ 1202.4, subd. (c).)

## III.  DISPOSITION

We remand to the trial court to impose the mandatory restitution and parole revocation restitution fines, or explain why there is a compelling and extraordinary reason for not doing so.  Thereafter, the trial court shall prepare an amended abstract of judgment reflecting whatever orders it makes and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, we affirm.

/S/

RENNER, J.

We concur:

/S/

HULL, Acting P. J.

/S/

KRAUSE, J.

16